633 A.2d 134

**John A. ZITELLI, M.D., Appellant,**

v.

**DERMATOLOGY EDUCATION AND RESEARCH FOUN-
DATION, a Nonprofit Corporation, and the University
of Pittsburgh, a Nonprofit Corporation, Appellees.**

Supreme Court of Pennsylvania.

Argued March 9, 1993.

Decided Nov. 8, 1993.

362

Henry E. Rea, Jr., Brandt, Milnes, Rea & Wise, Pittsburgh, for appellant.

Jon Hogue, Mollica, Murray & Hogue, Pittsburgh, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

## OPINION

MONTEMURO, Justice.

John A. Zitelli (Zitelli) appeals from an order of the Superior court vacating a decree of the Court of Common Pleas of Allegheny County which awarded Zitelli $1,226,292.00 from a deferred compensation plan. The issue involved in this appeal is whether the Superior Court erred in vacating the decree and finding that Zitelli was not entitled to any of the monies in a deferred compensation account. For the reasons set forth below, we reverse in part and affirm in part.

Zitelli is a physician and surgeon who specializes in Mohs Surgery.[1] He is one of a very limited number of physicians in the United States who specialize in this type of surgery. In 1980, Zitelli accepted a position at the University of Pittsburgh to join a newly formed Department of Dermatology within the University's School of Medicine and to teach Mohs surgery in the Medical School.

The dermatology department that Zitelli joined upon his arrival at the University was transformed into a clinical practice plan in 1981, and became known as the Dermatology Education and Research Foundation (DEAR). DEAR was incorporated as a non-profit corporation in 1981, and was one of a number of clinical practice plans in existence at the University. Clinical practice plans were developed by the University so that competitive salaries could be paid to University physicians, and so that the University could attract the highest qualified physicians. The practice plans were used as a method to supplement physician member income. Under the practice plans, all of the teaching physicians in a department would form a corporation to treat private patients. The

---

1. Mohs Surgery is a specialized form of cancer surgery whereby skin cancer lesions are treated beyond the standard surgical techniques. The procedure traces the origins of a skin lesion through a microscope, prior to surgery, and removes more of the routes of the lesion than conventional surgery.

income derived from the private patient practice would then be available both to supplement the overall income of the doctors in that specific practice plan, as well as to provide additional funds for educational and research projects with that Department.

As an employee of the University and DEAR, Zitelli's salary was subject to the guidelines and regulations of the University. The University's Guidelines provide that

Provided that the individual's obligations to the School are met, the salary of a member of the faculty may be supplemented with income from professional services; the amount shall not exceed an amount equal to the base, and the income from these professional services will also provide the fringe benefits that accrue to the supplemental salary. These provisions are to be approved by the Chairman and the Dean.

Thus, under the Guidelines, a physician could double his base salary with practice plan income.

Zitelli's first year salary at DEAR was $37,000. In addition to this base salary, Zitelli also received a supplement of $18,375 in his first year at DEAR. His University approved salary and supplement for his remaining years at DEAR was as follows:

| Year | Salary | Supplement |
|------|--------|------------|
| 1981–82 | $ 60,000 | $ 36,000 |
| 1982–83 | 70,000 | 58,500 |
| 1983–84 | 102,500 | 102,400 |
| 1984–85 | 109,675 | 109,674 |
| 1985–86 | 114,062 | 114,062 |
| 1986–87 | 143,520 | 143,520 |

His increase in salary over the years was largely due to the revenues he produced for DEAR. Because of the vast number of Mohs surgeries he performed, Zitelli was the major revenue contributor to DEAR.

As Zitelli's case load and resultant generation of income continued to increase, the possibility of developing a deferred compensation plan for Zitelli was discussed. The deferred compensation plan was intended to supplement Zitelli's in-

come, and to entice him to remain as a member of the Medical School faculty.

Contributions to a deferred compensation plan for Zitelli were made in 1982–83, 1983–84, 1984–85, and 1985–86. The amount of contributions each year, respectively, were $30,000, $50,000, $80,000 and $650,000. For the years 1986–87, no contributions were made to the account, but, according to Zitelli, a $410,000 payment had been approved.

In 1987, largely because of disagreements surrounding the deferred compensation account, Zitelli left the employment of DEAR. After his departure, Zitelli filed this action in equity against DEAR and the University seeking to obtain the amounts deposited in the deferred compensation account, the $410,000 which he claimed should have been deposited in the account, and severance pay which he claims was agreed upon by the board of directors of DEAR. DEAR, contrarily, contends that Zitelli is not entitled to any of the deferred compensation contributions because the payments far exceed the University's guidelines for acceptable salaries. Any payments in excess of the guidelines require University approval, which DEAR claims was not received in the instant case. Additionally, DEAR claims that Zitelli abused his position as a member of DEAR in his attempt to assure himself of the contributions. Finally, DEAR filed a counterclaim seeking to recover damages as a result of Zitelli's creation of leases for equipment from Zitelli's children to DEAR, and as a result of Zitelli's lease of an automobile with DEAR funds.

The trial judge, after several days of testimony, decided that Zitelli was entitled to receive the value of his deferred compensation plan, and that a $400,000 withdrawal from the plan after Zitelli's departure from DEAR was unauthorized.[2] The

2. At about the time when Zitelli submitted his resignation to DEAR in June of 1987, DEAR and the University put a freeze on the existing deferred compensation account. Zitelli then filed this suit in equity to have the funds distributed to him and to have the freeze on the account removed. Sometime after the freeze had been placed on the account by the University and DEAR, the University and DEAR withdrew $400,000 from the account to be used for their own purposes. This withdrawal was ordered to be returned to Zitelli by the trial court.

trial court also determined that the $410,000 contribution for the years 1986–87 was not approved, and that, therefore, Zitelli was not entitled to it. The trial court denied Zitelli's claim for severance pay on the basis that there was never a valid agreement in that regard. Finally, the trial court denied DEAR's counterclaim based on its finding that DEAR did not present sufficient evidence in support thereof.

On appeal, the Superior Court vacated the decree of the chancellor and determined that Zitelli was not entitled to any of the money in the deferred compensation account, or the $410,000 contribution for the years 1986–87. 409 Pa.Super. 219, 597 A.2d 1173. The Superior Court also approved the $400,000 withdrawal from the plan, and ordered that the plan be dissolved and the funds be available for the use of the Medical School. The severance pay claim by Zitelli was also denied by the Superior Court. Finally, the Superior Court found for DEAR on its counterclaim, and awarded the amount attributable to the lease of equipment to DEAR from Zitelli, paid for by DEAR, to be reimbursed to DEAR, and awarded any expense attributable to the lease of Zitelli's car to be reimbursed to DEAR.

On March 11, 1992 Zitelli's Petition for Allowance of Appeal was granted by this court. Although both Zitelli and DEAR raise numerous issues in their Statements of Questions Involved, the main issue for us to decide can be simply stated as whether the Superior Court abused its discretion in vacating the decree of the trial court, and in ordering that the deferred compensation plan be dissolved and that the funds be made available for the use of the University.

█ Initially, we note that in a civil action in equity wherein the Chancellor has made findings of fact and conclusions of law, our power of review is limited. The findings of the Chancellor will not be reversed unless it appears that he has clearly abused his discretion or committed an error of law. *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412 (1981). Furthermore we have held that

Where credibility of witnesses is important to the determination, the Chancellor's findings are entitled to particular weight because of his opportunity to observe their demeanor. Where a reading of the record reasonably can be said to reflect the conclusions reached by the Chancellor, a reviewing court may not substitute its judgment for that of the Chancellor. A reviewing court, however, is not bound by findings which are without support in the record or have merely been derived from other facts. (citations omitted).

*Id.* 493 Pa. at 142, 425 A.2d at 415.

Instantly, the Chancellor made 101 findings of fact and 13 conclusions of law. He determined that the first two contributions to the deferred compensation account were adequately approved by the requisite people. He further concluded that the remaining contributions were approved by Dr. Eaglestein and Zitelli and were adequately disclosed to DEAR and the University. As such, the Chancellor concluded that DEAR and the University were equitably estopped from denying Zitelli the benefits of the plan.

On review, the Superior Court determined that certain of the Chancellor's conclusions of law were erroneous. Specifically, the Superior Court held that the Chancellor erroneously concluded that the procedure utilized to approve the deferred compensation plan was sufficient. The Superior Court found that since the idea of a deferred compensation "plan" was never officially approved by DEAR and the University of Pittsburgh, Zitelli was not entitled to any of the money in the plan. The Superior Court found that DEAR and the University approved the first two deferred compensation contributions for Zitelli, but nevertheless found that Zitelli was not entitled to the money because the "deferred compensation plan" itself was never officially approved. The remaining contributions to the account, according to the Superior Court, were never approved and therefore Zitelli was not entitled to them.

After a careful review of the voluminous record in this case, we conclude that the Superior Court was correct in denying

Zitelli the contributions to the plan which were not approved by the University or DEAR, but erred in denying Zitelli the first two contributions which were properly approved. The Superior Court noted that the Chancellor properly determined that the first two contributions of $30,000 and $50,000 were approved by the University and DEAR. Nevertheless, the Superior Court refused to award these contributions to Zitelli because a deferred compensation "plan" was never actually approved by the University or DEAR. Without such "plan" approval, the Superior Court held that the approval of the contributions of $30,000 and $50,000 by the University and DEAR was essentially meaningless. We disagree.

■ While we recognize that Zitelli never received the proper approval for a deferred compensation "plan", we find that such approval was not a prerequisite to entitlement to the two contributions which were actually approved. University Guidelines require that any payments in excess of the Guideline amount require University approval. Instantly, the contributions of $30,000 and $50,000 were approved by the Chairman of DEAR, the Dean of the University, the University Chancellor, and the Compensation Committee of the Board of Trustees of the University of Pittsburgh. Regardless of whether or not a deferred compensation "plan" was ever approved, these University officials knowingly approved of the first two deferred compensation contributions. The validity of the $30,000 and $50,000 contributions was not dependent on the existence of a deferred compensation "plan" which had received the imprimatur of university approval, because the contributions themselves had been knowingly approved. Since the first two contributions were approved through appropriate University channels, Zitelli is entitled to them.

■ The remaining contributions to the deferred compensation account present another problem. As both the Chancellor and the Superior Court held, the remaining contributions to the account were never presented to or approved by the Dean or the Chancellor, or approved by the Compensation Committee. The $80,000 contribution in 1984–85 was ap-

proved only by Zitelli himself, as a member of the Board of Directors of DEAR, and Dr. Eaglestein, Chairman of DEAR. The $650,000 contribution in 1985–86 was again approved only by Zitelli and Eaglestein, however, Eaglestein's approval came after his resignation from DEAR, but was back-dated to appear as though it was given while he was still a member of the DEAR Board. Finally, for the 1986–87 years Zitelli was the only individual to approve of a contribution in the amount of $410,000. The new Chairman of DEAR refused to give his approval, and the contribution was never actually made.

As discussed above, under University Guidelines, any salary above the Guideline amount required proper University approval. There seems to be no question that the University never had the opportunity to approve these contributions. The parties are in disagreement as to whether DEAR properly approved these contributions. The University claims that since Zitelli was an interested director his approval was meaningless. Zitelli claims, however, that a majority of the directors of DEAR properly approved the contributions. We find, however, that it is immaterial whether or not there was proper DEAR approval. The Guidelines require University approval. The fact that DEAR did or did not approve the contributions is meaningless in light of the fact that there was no University approval. Consequently, even if there was legal DEAR approval, the contributions were required to be approved by the University. This was not done, and, therefore, the contributions were not properly approved.

The Chancellor recognized this deficiency, but nevertheless awarded Zitelli the last three contributions. He based his decision on the basis of equitable estoppel, and found that the University was estopped from denying the validity of the contributions because it was made aware of them through the annual financial statements submitted by DEAR to the Dean of the Medical School. These financial reports indicated that there was a deferred compensation account set up for one of the doctors in DEAR, and indicated the total value of the account. In light of the information obtained in these financial reports and because the University approved the first two

contributions, the Chancellor determined that the University waived its own Guidelines by failing to object to the payments when it became aware of them, and thus was estopped from precluding Zitelli from claiming the funds created in the deferred compensation account.

The Superior Court rejected the Chancellors analysis and found that he erred in applying the doctrine of equitable estoppel. It determined that Zitelli's wrongful conduct in securing the contributions prevented him from relying on estoppel, and that the estoppel claimed by Zitelli against the University was countermanded by the estoppel he created against himself. We agree.

█ Equitable estoppel, a doctrine sounding in equity, acts to preclude one from doing an act differently than the manner in which another was induced by word or deed to expect. *Novelty Knitting Mills, Inc. v. Siskind,* 500 Pa. 432, 457 A.2d 502 (1983). It "arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *In re Estate of Tallarico,* 425 Pa. 280, 288, 228 A.2d 736, 741 (1967). When estoppel is established, the "person inducing the belief in the existence of a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statements." *Id.* 425 Pa. at 288, 228 A.2d at 741.

█ There are two essential elements to estoppel; inducement and reliance. *Novelty Knitting* 500 Pa. at 432, 457 A.2d at 502. "The inducement may be words or conduct and the acts that are induced may be by commission or forbearance provided that a change in condition results causing disadvantage to the one induced." *Id.* 500 Pa. at 436, 457 A.2d at 503–504. More important, the laws require that

There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgement than the product of what defendant did or represented. The act must be induced by, and be the immediate or proximate result of, the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on. The representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel. If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely on them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise. Where there is no concealment, misrepresentation, or other inequitable conduct by the other party, a party may not properly claim that an estoppel arises in his favor from his own omission or mistake. Estoppel cannot be predicated on errors of judgment by person asking its benefit. (citations omitted).

*Tallarico*, 425 Pa. at 288–289, 228 A.2d at 741.

Instantly, the record indicates that Zitelli presented the first two contributions to University officials, and that University officials formally approved of these two contributions. The remaining contributions, however, were never presented to or approved by University officials. Zitelli was clearly aware, or certainly should have been aware, that since these contributions exceeded the Guidelines amount, they required University and DEAR approval. Zitelli's failure to seek such approval was an error of judgment which precludes his claim of estoppel. Furthermore, even Zitelli's claim that these contributions were approved by the Board of Directors of DEAR is flawed. As the Superior Court found, Zitelli, as an interested Director of DEAR, did not have the authority to vote on his own salary. *See* 15 Pa.C.S. Section 5728 and 18B AmJur2d, Corporations Section 1931. Zitelli's poor judgment in voting on his own compensation without a sufficient disinterested majority vote to support his position, along with Zitelli's own omission in failing to present the contributions to

University officials for approval, prevent him from relying on the doctrine of equitable estoppel.

■ Zitelli also relies on the submission of the financial reports to support his claim of equitable estoppel. He asserts that the University was made aware of the contributions through these reports, and that their failure to object when they became aware of the contributions acted as an inducement. However, as the Superior Court noted, the financial statement did not identify the name of the doctor for whom the deferred compensation account was created, nor did it indicate the amount of the annual contributions. Only the amount of the first year's contribution was ascertainable in the financial statement, and this amount was approved by the University. In the remaining statements, since the doctor's identity was not given and since the annual contributions were not listed, it would have been impossible for the University to determine that any particular years contribution exceeded the Guideline salary. Finally, Zitelli relies on only three financial reports indicating the amount of the deferred compensation account in 1983, 1984 and 1985. The first of these two payments were approved by the University. The third payment was only for $80,000, an amount which was not readily determinable from the financial report. By the time the University received the financial statement for 1986 when the largest contribution in the amount of $650,000 occurred, the University was already challenging the amount in the deferred compensation account. Thus, we find that the record negates any finding of inducement by the University, especially in light of Zitelli's questionable conduct in securing the contributions. Accordingly, the Superior Court correctly reversed the Chancellor's finding that Zitelli was entitled to the $80,000 contribution in 1984–85 and the $650,000 contribution in 1985–86.

■ As for the $410,000 contribution which Zitelli claims he was entitled to for the 1986–87 years, we find that both the Chancellor and the Superior Court were correct in finding that Zitelli was not entitled to this money. As the Chancellor noted, the $410,000 contribution was never approved in any

fashion, and therefore, Zitelli is not entitled to receive the same.

Accordingly, the order of the Superior Court is vacated in part and affirmed in part. Specifically, and in conclusion, we find that the Superior Court erred in finding that Zitelli was not entitled to the deferred compensation contributions made in the years 1982–83 and 1983–84. Accordingly, Zitelli is entitled to the $30,000 and $50,000 contributions and the interest earned therefrom. Zitelli, however, is not entitled to the remaining contributions in the deferred compensation account. We therefore affirm this portion of the Superior Court order and hold that the account, minus the two contributions to which Zitelli is entitled, is hereby dissolved and the funds contained therein are awarded to the use of the Medical School.

CAPPY, J., did not participate in the consideration or decision of this case.

LARSEN, J., did not participate in the decision of this case.