William BELLEVILLE
Bette Belleville

v.

DAVID CUTLER GROUP and Malvern Hunt Homeowners Association.

Appeal of: Malvern Hunt Homeowners Association.

William Belleville Bette Belleville

v.

David Cutler Group and Malvern Hunt Homeowners Association.

Appeal of: Malvern Hunt Homeowners Association.

William and Bette Belleville, h/w, Appellants

v.

David Cutler Group, Inc. and Malvern Hunt Homeowners Association.

Commonwealth Court of Pennsylvania.

Argued May 8, 2015.
Decided June 10, 2015.

Kevin M. Kelly, Berwyn, for designated appellant.

Andrew Schneider, Philadelphia, for designated appellees.

BEFORE: DAN PELLEGRINI, President Judge, P. KEVIN BROBSON, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge P. KEVIN BROBSON.

The Malvern Hunt Homeowners Association (Association) appeals from an order of the Court of Common Pleas of Chester County (trial court), striking certain amendments from the Association's Recorded Declaration. For the reasons stated below, we affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

### A. The Dispute

The David Cutler Group (Cutler) was the developer of a planned community known as Malvern Hunt (the Development), which consists of 279 properties and was subdivided into three communities: The Reserve, The Chase, and The Ridings. The Reserve consists of 101 minimum-maintenance single-family lots, The Chase consists of 95 carriage homes, and The Ridings consists of 83 standard single-family units. Open spaces and amenities, including tennis courts and two playgrounds, are owned and maintained by the Association. William and Bette Belleville (the Bellevilles) own property in The Ridings.

Membership in the Association consists of the 196 lot owners of The Chase and The Reserve. The Bellevilles and the other 82 residents of The Ridings are excluded from membership in the Association.

Per the requirements for creating a planned community under the Uniform Planned Community Act[1] (UPCA), Cutler filed a Declaration with the Office of the Recorder of Deeds for Chester County (Chester County Recorder of Deeds) on March 20, 2001 (the Recorded Declaration).[2] The Recorded Declaration provided that only members of the Association (*i.e.*, owners in The Chase and The Reserve) received snow removal services for their sidewalks and driveways, grass-cutting services, weed treatments and mulching services. The owners in The Ridings received no services from the Association and were responsible for all aspects of their own property maintenance.

The Recorded Declaration also provided that "Single Family Lots [ (The Ridings) ] shall be exempt from all assessments, charges or liens" except for a $1,000 contribution at the time of conveyance. (Recorded Declaration, art. IV, § 10;[3] Repro-

---

1. 68 Pa.C.S. §§ 5101–5414.

2. A planned community may be created only by recording a declaration executed in the same manner as a deed. Section 5201 of the UPCA, 68 Pa.C.S. § 5201.

3. Article IV, Section 10 of the Record Declaration states, in its entirety:

> The following properties subject to this Declaration shall be exempt from the assessments, charges and liens created here-

duced Record (R.R.) 895a.) Furthermore, the Recorded Declaration provided that, outside of the $1,000 lump sum payment made at the time of conveyance, "[n]o other terms or provisions of Article IV [ (pertaining to maintenance assessments) ] shall apply" to The Ridings. (Recorded Declaration, art. XI;[4] R.R. 910a.) The Recorded Declaration also prohibited the Association from making amendments to the Recorded Declaration that impose any further monetary obligation on owners in The Ridings.[5] (R.R. 907a.)

The Bellevilles purchased their home in August 2001, five months after the Recorded Declaration was recorded. The Bellevilles, however, did not receive a copy of the Recorded Declaration. Instead, Cutler provided the Bellevilles with a declaration that had not been recorded (Unrecorded Declaration), which contained different language than the Recorded Declaration. Specifically, the Unrecorded Declaration required residents of The Ridings to pay a one-time $1,000 contribution to the Association *plus* an annual assessment of 20% of the uniform assessment paid by the owners of The Chase and The Reserve. (Un-

recorded Declaration, art. XI; Ex. P–13 at 11, 29–30.) Cutler provided the Bellevilles with a summary of the Unrecorded Declaration (Summary), which provides, in pertinent part:

1. The open space and amenities within same as depicted on the approved subdivision plan for all of [the Development], which includes the carriage houses known as The Chase at Malvern Hunt, the minimum lot maintenance single family dwelling units known as The Reserve at Malvern Hunt and the standard single family lots known as The Ridings of Malvern Hunt is available for the use and enjoyment of the owners of lots and dwelling units in all three such areas.

. . .

3. The standard Single Family Lots [ (The Ridings) ] are intended to be owned and enjoyed without the Association providing any services with regard to snow removal, lawn mowing or any other type of lot maintenance. In short, the standard Single Family Lots are afforded the use and enjoyment of the Common Open Space, but the owners of

---

in: (a) all properties dedicated to and accepted by a government body, agency or authority, and devoted to public use; (b) all Common Open Space as defined in Article I, Section 1 hereof; (c) all Association Facilities as defined in Article I, Section 1 hereof. Notwithstanding any provisions herein, no land or improvements devoted to dwelling use shall be exempt from said assessments, charges or liens. Further, except as set forth in Article XI hereinbelow with regard to payment of an initial $1,000 contribution, Single Family Lots shall be exempt from all assessments, charges or liens.
(R.R. 895a.)

4. Article XI provides, in pertinent part:
The Single Family Lots and Single Family Lot Owners shall be bound only by those provisions of this Declaration set forth hereinabove as follows . . . :

Article IV. Shall not apply. Rather, at the time of conveyance of each Single Family Lot from Developer to a Single Family Lot Owner a lump sum payment of ONE THOUSAND DOLLARS ($1,000.00) shall be made in the same form and for the same purposes as set forth in Section 3, Article IV. No other terms or provision of Article IV shall apply.
(R.R. 909–10a.)

5. Recorded Declaration, art. X, § 1 ("Provided, however, that no amendment shall be permitted to any terms or provisions of this Declaration as affect solely the rights and provisions as apply to Single Family Lot Owners, as set forth in Article XI, hereinbelow, or which would in any manner impose any financial obligation upon such Single Family Lot Owners above and beyond those set forth herein.").

these lots are *not* members of the [Association] never to be assessed for use and enjoyment of the open space or in any other matter impacted by the operation of the Association.

4. Each standard Single Family Lot [(The Ridings)] will have contributed $1,000.00 toward the Association funds, as a one time only contribution upon settlement between the Developer and the initial buyer of each standard Single Family Lot. It shall be this sum, *in concert with the percentage payment of the annual assessment as set forth hereinbelow,* which will be the contribution towards use, enjoyment and maintenance of the Common Open Space, without any further financial obligation upon the standard Single Family Lots. *Article XI provides that each Single Family Lot Owner shall pay a sum equal to twenty percent (20%) of the annual assessment as established by the Association and applicable to all other types of lot owners being those within The Chase at Malvern Hunt and The Reserve at Malvern Hunt, which annual sum shall be the sole financial obligation upon Single Family Lot [(The Ridings)]*

*Owners with regard to the use, enjoyment and maintenance of the Common Open Space and Association Facilities, without any further financial obligation upon the standard Single Family Lots.* Moreover, the Declaration, at Article X, Section 1, expressly prohibits any future amendments to the Declaration that could affect the rights of the standard Single Family Lot Owners or impose any financial obligation above and beyond the initial $1,000.00 contribution *and the annual payment equal to twenty (20%) percent of the standard annual assessment as imposed by the Association on all other Lot Owners.*

(R.R. 942–43a (emphasis in original).) In reliance on the Unrecorded Declaration provided to them, the Bellevilles paid the 20% annual assessment.

More than two years later, in October 2003, Cutler filed and recorded with the Chester County Recorder of Deeds a First Amendment to the Recorded Declaration (First Amendment) to "clarify" that property owners in The Ridings were to pay an annual 20% assessment.[6] (R.R. 917a.) Notably, the First Amendment also, for the first time, indicates that owners in The

6. The First Amendment provides, in pertinent part:

1. Article IV, Section 10, is amended by striking the concluding sentence thereof and replacing with the following language:
Further, except as set forth in Article XI hereinbelow with regard to payment of an initial ONE THOUSAND DOLLAR ($1,000.00) contribution, and payment of not more than twenty (20%) percent of the annual assessment imposed on Lots within Village "C" (The Chase at Malvern Hunt) and Village "B" (The Reserve at Malvern Hunt) or twenty (20%) percent of the higher assessment if a differing assessment is, from time to time, imposed on Village "C" and Village "B", Single Family Lots shall be exempt from all assessments, charges or liens.
2. Article XI is amended as to applicable provisions of Article IV. The language with regard to Article IV commencing at

the bottom of page 29 of the Declaration is stricken and is to read as follows:
Article IV. Shall not apply. Rather, at the time of conveyance of each Single Family Lot from Developer to a Single Family Lot Owner a lump sum payment of ONE THOUSAND DOLLARS ($1,000.00) shall be made in the same form and for the same purposes as set forth in Section 3, Article IV. Each Single Family Lot Owner may further be assessed a sum equal to twenty (20%) percent of the annual assessment as established by the Association and applicable to all other types of Lot Owners (being those within The Chase at Malvern Hunt and The Reserve at Malvern Hunt), which annual sum shall be the sole financial obligation upon Single Family Lot Owners with regard to the use, enjoyment and maintenance of the Common Open Space and Association Facilities, without any further financial obligation upon the Single Family Lots. If the Association has

Chase and The Reserve may be charged differing annual assessments. The Recorded Declaration and Unrecorded Declaration both state, in Article IV, Section 3, that the annual assessment "shall be fixed at a uniform rate for all Lots." (R.R. 891a; Ex. P–13 at 11.) The Bellevilles and other homeowners in the Development were not notified of the First Amendment or provided with a copy.

In 2006, the Association took control of the Development from Cutler in accordance with Article II, Section 2 of the

> levied a different annual assessment upon the Lots within The Chase at Malvern Hunt from The Reserve at Malvern Hunt, in that event, the twenty (20%) percent assessment upon the Single Family Lots shall be based upon the higher of the assessments upon The Chase at Malvern Hunt and The Reserve at Malvern Hunt. No other terms or provisions of Article IV shall apply.
> (R.R. 918–19a.)

7. The Second Amendment is not at issue here.

8. The Third Amendment provides, in pertinent part:

> 1. Article IV, Section 10 is deleted and replaced in its entirety with the following: Section 10. Exempt Property. The following properties subject to this Declaration shall be exempt from the assessments, charges and liens created herein: (a) all properties dedicated to and accepted by a government body, agency or authority, and devoted to public use; (b) all Common Open Space as defined in Article I, Section 1 hereof; (c) all Association Facilities as defined in Article I, Section 1 hereof. Notwithstanding any provisions herein, no land or improvements devoted to dwelling use shall be exempt from said assessments, charges or liens. Further, except as set forth in Article XI hereinbelow with regard to payment of an initial ONE THOUSAND DOLLAR ($1,000.00) contribution, and payment of not more than twenty percent (20%) of the annual assessment imposed on Lots within Village "C" (The Chase at Malvern Hunt) and Village "B" (The Reserve at Malvern Hunt) or twenty percent (20%) of the

Recorded Declaration. On August 15, 2007, the Association filed a Second Amendment to the Recorded Declaration, allegedly to cure an ambiguity as it related to a budget shortfall (Second Amendment).[7]

On May 7, 2008, the Association recorded a Third Amendment to the Recorded Declaration, allegedly to cure an ambiguity regarding the collection of late fees, interests, costs, and attorney fees related to the non-payment of annual assessments (Third Amendment).[8] In January 2008, the Asso-

> higher assessment if a differing assessment is, from time to time, imposed on Village "C" and Village "B," Single Family Lots shall be exempt from all other special assessment, maintenance or open space assessments hereinafter imposed on the Lots. Provided, however, that the Single Family Lots shall not be exempt from any liens, charges, interest, late charges, costs or attorneys' fees otherwise imposed or authorized to be collected in accordance with applicable law or any other provisions of this Declaration (including, without limitation, those relating to the non-payment of annual assessments).
> 2. Article IX is amended as to applicable provisions relating to Article IV, which is stricken and replaced with the following: Article IV. Shall not apply, except as otherwise provided below or in Article IV of this Declaration. At the time of conveyance of each Single Family Lot from Developer to a Single Family Lot Owner a lump sum payment of ONE THOUSAND DOLLARS ($1,000.00) shall be made in the same form and for the same purposes as set forth in Section 3, Article IV. Each Single Family Lot Owner may further be assessed a sum equal to twenty (20%) of the annual assessment as established by the Association and applicable to all other types of Lot Owners (being those within The Chase at Malvern Hunt and The Reserve at Malvern Hunt). If the Association has levied a different annual assessment upon the Lots within The Chase at Malvern Hunt from The Reserve at Malvern Hunt, in that event, the twenty (20%) percent assessment upon the Sin-

ciation sent the Bellevilles an assessment notice that was calculated differently from all previous invoices. The 2008 assessment used a two-tiered format for owners in The Chase and The Reserve, and charged owners in The Ridings 20% of the higher amount. The Bellevilles disputed the calculation using the two-tiered system as unauthorized by the Declaration. The Bellevilles first learned of the amendments to the Recorded Declaration during the dispute, when the Association used the amendments to justify the higher assessment.

## B. Trial Court Proceedings

Unable to resolve their dispute with the Association, and believing that they had been wrongfully assessed under the terms of the Recorded Declaration, the Bellevilles filed a complaint on December 3, 2008, against Cutler and the Association, seeking declaratory judgment and compensatory and punitive damages. In Counts I through VI, the Bellevilles asked the trial court to "declare null and void" the First and Third Amendments. (R.R. 17–36a.) They argued that the First and Third Amendments were recorded without notice to *any* owner within the Development and without consent as required by Section 5219(d) of the UPCA, 68 Pa.C.S. § 5219(d), and in violation of the terms of Article X, Section 1 of the Recorded Declaration, which required 90–day advance written notice to all Owners of any amendments and prohibited any changes which "affect solely the rights and provisions as apply to Single Family Lot Owners [ (The Ridings) ] ... or which would in any manner impose any financial obligation upon such Single Family Lot Owners above and beyond

those set forth [in the Recorded Declaration]." (R.R. 907a.) In Count VII, the Bellevilles sought a refund from Cutler and the Association for the allegedly illegal annual assessments they collected from the Bellevilles. In Count VIII, the Bellevilles sought punitive damages from Cutler for "intentionally deceitful" conduct. (R.R. 37a.)

Cutler and the Association filed preliminary objections asserting, among other things, that the Bellevilles' claim as to the First Amendment was time-barred under Section 5219(b) of the UPCA.[9] On March 7, 2012, the trial court granted the preliminary objections in part, dismissing the Bellevilles' claims as to the First Amendment. Thereafter, the Bellevilles filed a motion to reconsider the March 7, 2012 order, which the trial court granted on April 30, 2012, vacating its March 7, 2012 order. The Association filed a motion to reconsider the April 30, 2012 order, which the trial court denied on May 24, 2012.

Prior to trial, Cutler filed a motion to dismiss the Bellevilles' cause of action for declaratory relief due to lack of jurisdiction for failure to join indispensable parties, namely the other 278 property owners in the Development. The trial court reserved its ruling until after the trial. A nonjury trial was held on October 16, 2012. On October 31, 2012, without ruling on the merits of the case, the trial court dismissed the Bellevilles' complaint in its entirety for failure to join indispensable parties. On appeal to this Court, the Bellevilles challenged only the trial court's dismissal of their causes of action seeking declaratory relief. By order dated Janu-

gle Family Lots shall be based upon the higher of the assessments upon The Chase at Malvern Hunt and The Reserve at Malvern Hunt.
(R.R. 926a.)

9. Section 5219(b) of the UPCA provides: "No action to challenge the validity of an amendment adopted by the association under this section may be brought more than one year after the amendment is recorded." 68 Pa. C.S. § 5219(b).

ary 3, 2014, we vacated the trial court's October 31, 2012 order, holding that the other 278 owners were not indispensable parties, and remanded the matter to the trial court for proceedings consistent with our opinion.[10]

On remand, the trial court, citing footnote 10 of this Court's opinion, considered only the declaratory judgment counts—*i.e.*, whether the First and Third Amendments were valid. In an opinion dated July 29, 2014, the trial court concluded that the First Amendment was not valid. It concluded that the Recorded Declaration was not ambiguous, and the First Amendment, therefore, could not be made as a technical correction under Section 5219(f) of the UPCA.[11] The trial court further concluded that the Association violated Section 5219(f) by failing to obtain an independent legal opinion, and that the First Amendment violated Section 5219(d) and it contradicted Article IV, Section 3 and Article X, Section 1 of the Recorded Declaration. The trial court likewise concluded that the Third Amendment was invalid because the Association failed to obtain an independent legal opinion in violation of Section 5219(f),

the amendment violated Section 5219(d), and it contradicted Article IV, Section 10 and Article X, Section 1 of the Recorded Declaration. The trial court's order, therefore, declared the First and Third Amendments void and stricken and allowed any party to record a copy of the July 29, 2014 order with the Chester County Recorder of Deeds.

## II. ISSUES ON APPEAL

■ On appeal [12] to this Court, the Association alleges various abuses of discretion and errors of law by the trial court: (1) the trial court erred in overruling the Association's preliminary objections because the Bellevilles' challenge to the First Amendment is time-barred; (2) the trial court erred in reconsidering its March 7, 2012, order because there were no legal grounds on which to reconsider it; (3) the trial court abused its discretion when it denied the Association's motion for reconsideration; (4) the trial court abused its discretion and/or erred as a matter of law when it denied the Association's motion for nonsuit at trial; (5) the trial court abused its discretion and/or erred as a matter of

---

10. *Belleville v. David Cutler Group, Inc.*, 2014 WL 29348 (Pa.Cmwlth., No. 284 C.D.2013, filed January 3, 2014).

11. 68 Pa.C.S. § 5219(f). At the time the First Amendment was filed, Section 5219(f) provided:

Technical corrections.—Except as otherwise provided in the declaration, if any amendment to the declaration is necessary† in the judgment of the executive board to do any of the following:

 (1) cure an ambiguity;

 (2) correct or supplement any provision of the declaration, including the plats and plans, that is defective, missing or inconsistent with any other provision of the declaration or with this subpart;

 (3) conform to the requirements of any agency or entity that has established national or regional standards with respect to loans secured by mortgages or deeds of

trust or units in planned community or so-called "PUD" [(planned unit development)] projects, such as Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation;

the executive board may effect an appropriate corrective amendment without the approval of the unit owners or the holders of liens on the planned community, upon receipt of an opinion from independent legal counsel to the effect that the proposed amendment is permitted by the terms of this subsection.

12. "Our standard of review in a declaratory judgment action is limited to determining whether the trial court's findings are supported by substantial evidence, whether an error of law was committed or whether the trial court abused its discretion." *Yost v. McKnight*, 865 A.2d 979, 982 n. 6 (Pa. Cmwlth.2005).

law when it failed to adopt the Association's proposed findings of fact and conclusions of law; (6) the trial court abused its discretion in making its findings of fact; and (7) the trial court's July 29, 2014 order contained the following errors of law: (a) Cutler and the Association followed proper procedure in amending the Recorded Declaration; (b) the Bellevilles' claims are barred by the one-year statute of limitations; (c) the Bellevilles' claims are barred by the doctrine of unclean hands; (d) the Bellevilles' claims are barred by the doctrine of laches; (e) the Bellevilles' claims are barred by the doctrine of equitable estoppel; (f) the Bellevilles' claims are barred by the doctrine of promissory estoppel; (g) the Bellevilles' claims are barred by an agreement at law; and (h) the trial court erred in allowing any party to record a copy of the July 29, 2014 order with the Chester County Recorder of Deeds. The Bellevilles filed a cross-appeal, in which they allege that the trial court committed an error of law when it concluded that they had waived their claims for damages and abused its discretion by failing to order the Association to pay part of the cost of recording the July 29, 2014 decision.

### III. ANALYSIS

#### A. Association's Appeal

The Association contends, multiple times throughout its brief, that the Bellevilles' claims are time-barred by Section 5219(b) of the UPCA, which provides: "No action to challenge the validity of an amendment adopted by the association under this section may be brought more than one year after the amendment is recorded." 68 Pa.C.S. § 5219(b). The Association argues that Section 5219(b) applies to all amendments, including those made under Section 5219(f) of the UPCA. When interpreting a statute, this court presumes that the General Assembly "does not in-

tend a result that is absurd, impossible of execution or unreasonable." Section 1922(1) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922(1). Thus, the court may consider "the practical results of a peculiar interpretation" when construing a statute. Unionville–Chadds Ford Sch. Dist. v. Rotteveel, 87 Pa.Cmwlth. 334, 487 A.2d 109, 112–13 (1985). Furthermore, "[i]t is well established that whenever a court construes one section of a statute, it must read that section not by itself, but with reference to, and in light of, the other sections." Commonwealth v. Mayhue, 536 Pa. 271, 639 A.2d 421, 439 (1994). We begin, therefore, by examining the whole of Section 5219 of the UPCA.

Section 5219 of the UPCA dictates how amendments to a declaration may be made. Section 5219(a)(1) of the UPCA establishes, as a baseline, that a declaration may only be amended when voted on or agreed to by at least 67% of the votes in an association, although it also allows for a larger or smaller percentage of votes under certain circumstances not applicable here. 68 Pa.C.S. § 5219(a)(1). The rest of Section 5219(a) of the UPCA identifies exceptions to the general rule that declarations may only be amended by vote or agreement as provided for in subsection (a)(1). For instance, subsection (a)(2) provides that unanimous consent may be required for some types of amendments, and subsection (a)(3) excludes certain types of amendments from the requirements of subsection (a)(1) all together. 68 Pa.C.S. § 5219(a)(2) and (3). One type of amendment excluded from the approval requirements of subsection (a)(1) are amendments made pursuant to Section 5219(f) of the UPCA, which allows "technical corrections" to be made by a declarant and recorded under certain circumstances without approval by the association. See 68 Pa.C.S. §§ 5219(a)(3)(ii)(A) and 5219(f).

Under the Association's interpretation of Section 5219 of the UPCA, the executive board of the Association could unilaterally make any amendment it chooses—regardless of how large or material a change—without notice to or vote by the Association members, so long as the board declares the amendment to be a technical correction under Section 5219(f) of the UPCA. Furthermore, under the Association's interpretation, pursuant to Section 5219(b) of the UPCA, Association members would have no form of recourse unless they somehow discover, without the benefit of any notice or vote, that an amendment has been recorded and bring an action within one year of the recording of that amendment. This is the exact type of absurd result the General Assembly is presumed not to intend. Furthermore, it would frustrate the purpose of Section 5219(a), which is to ensure that a majority of association members are aware of and agree to material changes in the documents which govern the rights, responsibilities, obligations, and powers of the association, its members, and its board. Clearly, the time limitations set forth in Section 5219(b) apply to the non-technical amendments authorized by Section 5219(a)(1), because those amendments require a vote or agreement of the members of an association, such that some form of notice is implied. The Association's interpretation, however, which applies the time limitation to technical amendments under Section 5219(f), for which no vote, agreement, or notice are required, fails to take into account the entirety of Section 5219 and leads to an absurd result. For those reasons, the trial court did not err in concluding that the Bellevilles' claims were not time-barred by Section 5219(b) of the UPCA.[13] *See Mayhue,* 639 A.2d at 439

(rejecting a plain meaning argument which failed to read the section with reference to, and in light of, other sections); *Commonwealth v. Horton,* 465 Pa. 213, 348 A.2d 728, 732 (1975) (rejecting statutory interpretation which led to absurd result).

The Association argues that the trial court erred in granting the Bellevilles' motion for reconsideration of its March 7, 2012 order. Citing federal case law, the Association argues that the Bellevilles failed to establish one of three grounds for reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct an error of law or prevent a manifest injustice. Association's Br. at 37 (citing *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999)). In fact, the Bellevilles' motion and the trial court's decision to grant reconsideration were based on the argument that the March 7, 2012 ruling, which held that the challenge to the First Amendment was time-barred by Section 5219(b) of the UPCA, was legally erroneous. The trial court agreed that the action was not time-barred, and, as our discussion above reveals, so do we.

 Furthermore, the standard cited by the Association has not been adopted in Pennsylvania courts. A motion for reconsideration "is addressed to the sound discretion of the trial court." *Moore v. Moore,* 535 Pa. 18, 634 A.2d 163, 166 (1993). We will not disturb the trial court's grant of reconsideration absent an abuse of discretion or error of law. *See Dahl v. AmeriQuest Mortg. Co.,* 954 A.2d 588, 593 (Pa.Super.) ("[T]he standard of review of a motion for reconsideration is limited to whether the trial court manifestly abused its discretion or committed an error of law."), *appeal denied,* 599 Pa. 693,

---

**13.** We note that the Third Amendment was filed on April 17, 2008, and that the Bellevilles' complaint was filed on December 3, 2008, well within the one-year time period set forth in Section 5219(b) of the UPCA.

960 A.2d 840 (2008). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Smith,* 543 Pa. 566, 673 A.2d 893, 895 (1996). The Association has not alleged any unreasonableness, partiality, prejudice, bias or ill-will on the part of the trial court, and we perceive none. We, therefore, conclude that the trial court did not err as a matter of law or abuse its discretion in granting the Bellevilles' motion for reconsideration.

■ The Association also contends that the trial court erred in denying the Association's motion for reconsideration of the April 30, 2012 order because the Bellevilles did not oppose the motion. As stated above, the grant or denial of a motion for reconsideration is within the sound discretion of the trial court. Here, the Association asked the trial court to reconsider its grant of reconsideration of its March 7, 2012 order, and the trial court denied the order before the Bellevilles' response was due. We perceive no abuse of discretion, as defined above, in the trial court's denial of the Association's motion prior to the filing of a response by the Bellevilles.

The Association next alleges that the trial court erred when it denied the Association's motion for nonsuit following the close of the Bellevilles' case-in-chief. The trial court may enter nonsuit only if it could not reasonably conclude that the elements of the cause of action have been established. *See Thomas v. City of Philadelphia,* 804 A.2d 97, 107 n. 16 (Pa. Cmwlth.), *appeal denied,* 572 Pa. 728, 814 A.2d 679 (2002), *cert. denied,* 538 U.S. 1057, 123 S.Ct. 2219, 155 L.Ed.2d 1106 (2003); Pa. R.C.P. No. 230.1(a)(1). Because we conclude that the amendments were invalid per our discussion below, the

trial court did not err in refusing to grant the Association's motion for nonsuit.

■ Next the Association argues that the trial court abused its discretion and/or committed an error of law when it failed to adopt the Association's proposed findings of fact and conclusions of law. "The court may adopt a party's proposed findings and conclusions as it deems warranted or it may state its findings and conclusions in its own language." *Commonwealth ex rel. Bloomsburg State College by Nossen v. Porter,* 148 Pa.Cmwlth. 188, 610 A.2d 516, 518 (1992) (citing Goodrich–Amram 2d § 1516:2 at 83), *appeal denied,* 534 Pa. 650, 627 A.2d 181 (1993). Furthermore, "[t]he finder of fact is [the] sole judge of credibility and is free to believe all, part, or none of the evidence. This is true of a judge in a bench trial, as well as a jury." *In re Funds in Possession of Conemaugh Twp. Supervisors,* 562 Pa. 85, 753 A.2d 788, 790 (2000). The trial court was not obligated to agree with or adopt either party's proposed findings of fact or conclusions of law, and failure to do so does not constitute either an abuse of discretion or error of law.

The Association contends that the trial court abused its discretion in making its own findings of fact.

> In a bench trial, the trial judge acts as fact-finder and has the authority to make credibility determinations and to resolve conflicts in evidence. Consequently, the trial judge's findings made after a bench trial must be given the same weight and effect as a jury verdict and will not be disturbed on appeal unless they are not supported by competent evidence in the record.

*Merrell v. Chartiers Valley Sch. Dist.,* 51 A.3d 286, 293 (Pa.Cmwlth.2012) (internal citation omitted); *see also In re Funds in Possession of Conemaugh Twp. Supervisors,* 753 A.2d at 790 ("The finder of fact is

[the] sole judge of credibility and is free to believe all, part, or none of the evidence."). The Association does not argue that the trial court's findings are unsupported by the evidence in the record, but instead argues that the trial court should have believed its evidence over the Belleyilles' evidence or interpreted the evidence offered in another way. These arguments go to the credibility and weight of the evidence, issues within the sole province of the trial court as the fact finder, and we will not disturb them on appeal. *See Merrell,* 51 A.3d at 293; *In re Funds in Possession of Conemaugh Twp. Supervisors,* 753 A.2d at 790. Furthermore, we conclude that the trial court's findings are supported by competent evidence in the record, and as such, the trial court did not abuse its discretion.

The Association's main argument on the merits is that the Recorded Declaration was properly amended in accordance with Section 5219(f) of the UPCA and that the trial court erred, therefore, in concluding the amendments were invalid. The Association argues that the First and Third Amendments were made to clarify an ambiguity and as such were technical corrections pursuant to Section 5219(f) of the UPCA. Because they were technical corrections under Section 5219(f), the Association argues, it was not required to notify residents of the Development or allow the members of the Association to vote on the amendments.

"A contract is ambiguous if it is reasonably susceptible to different interpretations and capable of being understood in more than one sense." *Mayflower Square Condo. Ass'n v. KMALM, Inc.,* 724 A.2d 389, 394 (Pa.Cmwlth.1999). Furthermore, any ambiguity will be construed against the drafter. *Clairton Slag, Inc. v. Dep't of General Servs.,* 2 A.3d 765, 773 (Pa.Cmwlth.2010), *appeal denied,* 612 Pa. 700, 30 A.3d 489 (2011). Whether or not a contract is ambiguous is a question of law. *Id.*

The Association spends most of its time arguing that the Recorded Declaration was ambiguous because it was inconsistent with the Summary and Unrecorded Declaration given to homeowners in the Development. The trial court concluded, and we agree, that "the Association mudd[ies] the discussion of ambiguity by referring continually to ambiguity created by reading several documents together." (Trial Ct. Op. at 6.) External inconsistences cannot make the Recorded Declaration ambiguous; such ambiguity must be contained within the document itself. Furthermore, we note that the First Amendment did more than simply bring the Recorded Declaration into line with the Unrecorded Declaration and Summary by imposing a 20% assessment. It also, for the first time, indicated that owners in The Chase and The Reserve could be charged differing assessments.

The Association also refers to the following language contained in Section 10, Article IV of the Recorded Declaration as ambiguous:

> Notwithstanding any provisions herein, no land or improvements devoted to dwelling use shall be exempt from said assessments, charges or liens. Further, except as set forth in Article XI hereinbelow with regard to payment of an initial $1,000 contribution, Single Family Lots shall be exempt from all assessments, charges or liens.

(R.R. 895a.) We disagree. While this language may, at first blush and if read in isolation, appear ambiguous, it is clear from the rest of the Recorded Declaration, and specifically from the rest of Article IV, that Single Family Lots (*i.e.,* The Ridings) are exempt from all assessments, charges, or liens. Article IV, Section 1, which establishes the Association's right to levy

annual and special assessments, speaks only in terms of "Lots" and "Owners." Both Lot and Owner are specially defined terms within the Recorded Declaration:

> (g) "Lot" shall mean and refer to any plot of land intended and subdivided for fee simple conveyance for residential carriage house use or minimum lot maintenance single family home, all as shown upon the recorded subdivision plat of Malvern Hunt as Village–"C" and Village–"B" respectively. No Lot shall be severed from the covenants, restriction, easements and conditions herein contained.

> (h) "Owner" shall mean and refer to the record owner, excluding the Developer, whether one or more persons or entities, of the fee simple title to any Lot but shall not mean or refer to any mortgagee or subsequent holder of a mortgage, unless and until such mortgagee or holder has acquired title pursuant to foreclosure or any proceeding in lieu of foreclosure.

(Article I, Section 1(g)-(h); R.R. 884a.)

Additionally, the definitions of "Single Family Lot" (*i.e.*, The Ridings) explicitly excludes "Single Family Lot" from inclusion in the definition of "Lot." (Article I, Section 1(k) ("A Single Family Lot is separate and distinct from a "Lot" as defined in subparagraph (g) hereinabove."); R.R. 885a.) "Single Family Lot Owner" is similarly excluded from inclusion in the definition of "Owner." (Article I, Section 1(l). ("Such Single Family Lot Owner is separate and distinct from an "Owner" as defined in subparagraph (h) hereinabove."); R.R. 885a.) Thus, it is clear that the establishment of annual and special assessments in Article IV was never intended to include The Ridings or homeowners in The Ridings, such as the Bellevilles. Such exclusion makes sense, given that owners in The Ridings are not members of the Association with a say in the assessments charged and do not receive any of the services, such as snow removal and lawn care, that those in The Chase and The Reserve receive. Furthermore, the First Amendment represents such a material change in terms that it cannot be considered technical in any sense of the word. Thus, because the Recorded Declaration was not ambiguous, the Association could not amend it under Section 5219(f) of the UPCA.

As for the Third Amendment, much of which is a repeat of the First Amendment, our reasoning above applies in equal measure. The Association argues that the Third Amendment was necessary to clarify that Single Family Lot Owners were required to pay late fees and other charges imposed for failure to pay the annual assessment on time, which was ambiguous after the First Amendment. Even if the First Amendment were valid, we perceive no such ambiguity. The First Amendment, in addition to imposing the 20% assessment, declared that Single Family Lots, with the exception of the 20% assessment, "shall be exempt from all assessments, charges or liens," and that "[n]o other terms or provisions of Article IV shall apply [to Single Family Lots]." (R.R. 918–19a.) Late fees and other liens, charges, interest, costs or attorney fees, are clearly other "assessments, charges and liens." Furthermore, such fees and charges are imposed by Section 8 of Article IV (R.R. 894a), which under the explicit terms of the First Amendment, do not apply to Single Family Lots. (*See* R.R. 919a.) Thus, the First Amendment clearly exempted Single Family Lots from late fees and other associated charges. With no discernable ambiguity in the Recorded Declaration, or the Recorded Declaration as amended by the First Amendment, the Association was not permitted to record the Third Amendment as a technical correction under Section 5219(f) of the UPCA.

 Additionally, the trial court concluded that even if such ambiguity existed, the First and Third Amendments were procedurally invalid because the Association failed to obtain an "opinion from independent legal counsel" that the amendment was permitted, as required under Section 5219(f) of the UPCA. The Association argues that Richard McBride, Esquire, counsel for Cutler, drafted the First Amendment and provided the requisite legal opinion. Similarly, for the Third Amendment, the Association argues that Sean O'Neill, Esquire, provided an independent legal opinion. Mr. O'Neill was a member of the firm Lentz, Cantor and Massey, which had been hired to represent the Association in the Belleville matter, and another member of the firm, Steve Sutton, Esquire, drafted the Third Amendment. The trial court concluded that "[a] single firm representing the Association, drafting the amendment and issuing the required opinion letter hardly results in the type of independent review contemplated by the [UPCA]." (Trial Ct. Op. 11.) We agree. "Independent legal counsel" is not defined by the UPCA, and as such, we must give the words their ordinary meaning. See Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a) ("Words and phrases shall be construed according to rules of grammar and according to their common and approved usage."). In the ordinary usage of the word independent, one would not consider an attorney and/or law firm already hired by a client to be independent, as they are clearly affiliated with and, to some extent, controlled by their client.[14]

The Association argues that the trial court should have concluded that "Section 5219(f) of the UPCA [was] satisfied, regardless of whether the Court believed the Association obtained guidance from an independent legal counsel." (Association Br. at 58.) We cannot agree. Obtaining an independent legal opinion about a proposed "technical correction" under Section 5219(f) is clearly a requirement set forth by Section 5219(f) in order for an amendment made under that section to be valid. The Association offers no argument or legal reasoning for discounting this requirement, and we decline to do so.

Furthermore, we note, as the trial court did, that even if the amendments were procedurally valid, the First and Third Amendments would be substantively invalid because they violate other provisions of the Recorded Declaration. In particular, those amendments would violate Article IV, Section 3, which has never been amended and requires annual assessment to be "fixed at a uniform rate for all Lots," (R.R. 891a), Article IV, Section 10, which exempts Single Family Lots from all assessments, charges or liens, (R.R. 895a), Article X, Section 1, which prohibits any amendment which "affect[s] solely the rights and provisions as apply to Single Family Lots Owners ... or which would in any manner impose any financial obligation upon Single Family Lot Owners above and beyond those set forth herein," (R.R. 907a), and Article XI, which provides that no other terms or provisions of Article IV apply to Single Family Lots, (R.R. 910a).

The Association then argues that the Bellevilles' claims are barred by several legal doctrines. First, the Association again asserts that Section 5219(b) of the UPCA bars the Bellevilles' claims. As we have already determined that the Bellevilles' claims are not time-barred under

---

14. Merriam Webster defines "independent" as "not subject to control by others" or "not affiliated with a larger controlling unit." <span></span>MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 633 (Frederick C. Mish et al. eds., 11th ed.2003).

Section 5219(b) above, we need not repeat our reasoning here.

Second, the Association asserts that the Bellevilles' claims are barred by the doctrine of unclean hands. The doctrine of unclean hands allows a court to "deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy in issue." *Terraciano v. Dep't of Transp., Bureau of Driver Licensing,* 562 Pa. 60, 753 A.2d 233, 237–38 (2000) (internal citation omitted). The Association appears to be arguing that the Bellevilles were somehow guilty of bad conduct, fraud or deceit simply by virtue of the fact that they instituted this action after paying the assessment without complaint from 2001–2008. We agree with the trial court's conclusion that the Bellevilles did not come to the trial court with unclean hands simply because they exercised their legal rights. *See id.* at 238 & n. 11 (rejecting Department of Transportation's argument that licensee had unclean hands because she accepted her statutory reprieve and then exercised her right to appeal her suspension).

Third, the Association asserts that the Bellevilles' claims are barred by the doctrine of laches. The doctrine of laches "bars relief when the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice." *Leedom v. Thomas,* 473 Pa. 193, 373 A.2d 1329, 1332 (1977) (internal quotation marks omitted). As stated above in our statute of limitation discussion, the Bellevilles first had reason to learn of the amendments in 2008, after which they instituted this suit within the one year period allowed under the UPCA. As such we cannot conclude that the Bellevilles failed to exercise due diligence in bringing this action and, thus, the doctrine of laches does not apply.

Fourth, the Association contends that the Bellevilles' claims are barred by equitable estoppel. "[E]quitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity." *Novelty Knitting Mills, Inc. v. Siskind,* 500 Pa. 432, 457 A.2d 502, 503 (1983). "The two essential elements of equitable estoppel are inducement and justifiable reliance on that inducement." *Id.*

> The inducement may be words or conduct and the acts that are induced may be by commission or forbearance *provided that a change in condition results* causing disadvantage to the one induced. More important, the laws require that ... The representation or conduct *must of itself* have been sufficient to warrant the action of the party claiming the estoppel.

*Zitelli v. Dermatology Educ. & Research Found.,* 534 Pa. 360, 633 A.2d 134, 139 (1993) (emphasis added) (citation omitted) (internal quotation marks omitted). The Association argues that it will be injured if the Bellevilles do not pay assessments, but it has identified no action it was induced to take or abstain from in reliance on any promise from the Bellevilles. In fact, the Association does not identify any change in its behavior as a result of reliance upon the Bellevilles' payments, and indeed could not identify any such change as it provides no services directly or specifically to the Bellevilles—or any other member of The Ridings—and has no obligations to the Bellevilles independent from its obligations to residents of The Chase and The Reserve. Thus, the Association has failed to establish the necessary elements for equitable estoppel.

Fifth, the Association asserts that the Bellevilles' claims are barred by promissory estoppel. Promissory estoppel, like equitable estoppel, requires both inducement and detrimental reliance. *Matarazzo v. Millers Mut. Grp., Inc.*, 927 A.2d 689, 692 (Pa.Cmwlth.2007) ("Under this theory, a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcing the promise."). As discussed above, the Association identifies no action or forbearance it was induced to take by the Bellevilles and, as such, fails to establish the elements of promissory estoppel.

Sixth, the Association argues that under the decisional law of our courts, the Association has a right to assess property owners for the use or maintenance of the common facilities regardless of the language in the property owner's chain of title. The Association cites *Meadow Run and Mountain Lake Park Association v. Berkel*, 409 Pa.Super. 637, 598 A.2d 1024 (1991), *appeal denied*, 530 Pa. 666, 610 A.2d 46 (1992), *Spinnler Point Colony Association, Inc. v. Nash*, 689 A.2d 1026 (Pa. Cmwlth.1997), and *Hess v. Barton Glen Club, Inc.*, 718 A.2d 908 (Pa.Cmwlth.1998), *appeal denied*, 558 Pa. 623, 737 A.2d 745 (1999), for the proposition that even if the power of a homeowners association to levy assessments for the use and maintenance of common areas is not mentioned in the owners' chain of title, there is an implied agreement at law that homeowners must pay a portion of the cost to maintain such common areas. Each of these cases is easily distinguishable from the present case, however, because in each of them the owner's chain of title was *silent* about assessments paid for the maintenance of the common areas. *See Meadow Run*, 598 A.2d at 1027 (holding that "absent an express agreement prohibiting assessments ... inherent in [the homeowners associa-

tion's] authority is the ability to impose reasonable assessments on the property owners to fund the maintenance of [common] facilities"); *Spinnler Point*, 689 A.2d at 1028–29 (holding that owners were required to pay assessments despite fact that their chain of title made no reference to homeowners association); *Hess*, 718 A.2d at 912 ("When the owners of property in a residential development are permitted to use the common areas of a development, there is an implied agreement to accept a portion of the cost of maintaining those facilities. And, where a deed is silent on whether a homeowners' association has the authority to make such an assessment, the homeowners may be assessed their proportionate costs of common improvements.").

Here, the Bellevilles' chain of title was not silent as to assessment for maintenance of the common areas; instead, such assessment was *explicitly prohibited* by the terms of the Recorded Declaration. Thus, *Meadow Run, Spinnler Point,* and *Hess* are all inapplicable, and we decline to hold that an association can assess a property owner a maintenance fee when such assessment is prohibited by the terms of the declaration. *See also* Section 5302(a) of the UPCA, 68 Pa.C.S. § 5302(a) (providing that association may impose assessments for use and maintenance of common areas "subject to the provisions of the declaration").

Finally, the Association asserts that the trial court exceeded its authority in allowing any party to record its July 29, 2014 order because the Bellevilles did not request that relief. It is true that a trial court generally exceeds its authority if it grants relief outside of that requested. *See Williams Twp. Bd. of Supervisors v. Williams Twp. Emergency Co., Inc.*, 986 A.2d 914, 921 (Pa.Cmwlth.2009) ("[W]hile a chancellor in equity may fashion a remedy

that is narrower than the relief requested, he or she may not grant relief that exceeds the relief requested."). The Bellevilles, however, twice requested "any further relief as is just and appropriate," (R.R. 36a, 38a), a request we think broad enough to encompass the relief awarded by the trial court. Thus, the trial court did not err.

### B. Bellevilles' Appeal

■ On cross-appeal, the Bellevilles argue that the trial court committed an error of law when it concluded that they had waived their claims for damages. In our previous opinion, this court noted that the October 31, 2012 order "dismissed the entire Complaint, not just the counts for declaratory relief. However, [the Bellevilles'] appeal only concerns the trial court's dismissal of their cause of action seeking declaratory relief." *Belleville v. David Cutler Group, Inc.*, 2014 WL 29348 (Pa.Cmwlth., No. 284 C.D.2013, filed January 3, 2014), slip op. at 8 n. 10. Likewise, in footnote 15, this Court noted that "the only issue is whether the Amendments were valid." *Id.* at 18 n. 15. The trial court, interpreting this Court's previous order in this case, concluded that the Bellevilles failed to appeal the portion of the trial court's October 31, 2012 order dismissing their claims for damages and had, therefore, waived those claims. We disagree with the trial court's interpretation of our previous order. Our January 3, 2014 order reinstated the Bellevilles' claims for declaratory judgement. It necessarily follows that the Bellevilles' thus retained the ability to pursue any relief available and requested based upon those claims. Our prior opinion did not foreclose the remedies available and sought by the Bellevilles, regardless of how they were characterized in the complaint.

Lastly, the Bellevilles argue that the trial court abused its discretion because it did not order the Association to pay part of the cost of recording the July 29, 2014 order. The Bellevilles cite no authority in support of this argument and also fail to point to any partiality, prejudice, bias, or ill-will that would constitute an abuse of discretion. *See Smith,* 673 A.2d at 895. We, therefore, decline to conclude that the trial court abused its discretion by failing to include such a provision in its July 29, 2014 order.[15]

For the reasons discussed above, the order of the trial court is hereby affirmed in part and reversed in part. The portion of the trial court's order finding waiver of the Bellevilles' request for relief in the nature of damages is hereby reversed, and this matter is remanded to the trial court with instruction to consider whether the Bellevilles are entitled to such relief. In all other respects, the order of the trial court is hereby affirmed.

### ***ORDER***

AND NOW, this 10th day of June, 2015, the order of the Court of Common Pleas of Chester County (trial court) is hereby AFFIRMED in part and REVERSED in part. The portion of the trial court's order finding waiver of the Bellevilles' request for relief in the nature of damages is hereby REVERSED, and this matter is REMANDED to the trial court with instruction to consider whether the Bellevilles are entitled to such relief. In all other respects, the order of the trial court is hereby AFFIRMED.

Jurisdiction relinquished.

---

**15.** Whether the Bellevilles may recover the cost of recording the order as a taxable cost

under Pennsylvania Rule of Appellate Procedure 2741 is not before us.