# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kuharchik Construction, Inc., :
                 Petitioner :
                                  :
              v. : No. 486 F.R. 2015
                                    : Argued: June 9, 2020
Commonwealth of Pennsylvania, :
                 Respondent :

BEFORE:     **HONORABLE RENÉE COHN JUBELIRER,** Judge
                   **HONORABLE ELLEN CEISLER,** Judge (P.)
                   **HONORABLE BONNIE BRIGANCE LEADBETTER,** Senior Judge

**OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED: July 15, 2020**

Kuharchik Construction, Inc. (Petitioner) petitions for review of an Order of the Board of Finance and Revenue (Board) dated July 21, 2015, granting in part and denying in part Petitioner's Petition for Review of the use taxes imposed against certain items, "including, *inter alia*, traffic signals, traffic signal poles, lights, light poles, cameras, camera poles, mast arms, pedestals, and pedestal bases" by the Department of Revenue (Department) pursuant to Section 202(b) of the Tax Reform Code of 1971[1] (Code), 72 P.S. § 7202(b). (Stipulation (Stip.) ¶ 15.) On appeal, Petitioner seeks review of only the portion of the Board's Order that denied Petitioner relief from the use taxes assessed against the following four categories of items: (1) signal poles with mast arms; (2) light poles with mast arms; (3) camera poles with mast arms; and (4) pedestal bases (collectively, the Contested Items). (*Id.* ¶ 26.) Before this Court, Petitioner first argues that the Board erred in denying it

_____

[1] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§ 7101-10004.

relief with respect to its purchase and use of items that support a traffic signal head, including signal poles, mast arms, and pedestal bases, which Petitioner refers to as its Traffic Signal Related Purchases, because those items are exempt from the Commonwealth's use tax as "building machinery and equipment" (BME). Petitioner additionally argues that the Commonwealth is estopped from assessing use taxes against any of the Contested Items because the Commonwealth did not previously assess taxes against similar items in the past. Upon careful review, we affirm in part and reverse in part.

## I. Background

As required by Rule 1571(f) of Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1571(f), the parties submitted Joint Stipulations of Fact (Stipulation), and stipulated to the following relevant facts. Petitioner is a Pennsylvania corporation engaged in the electrical construction contractor business. (Stip. ¶ 13.) In the course of its business, Petitioner contracts with the Commonwealth and its subdivisions. (*Id.* ¶ 14.) "Pursuant to some of these contracts, [Petitioner] purchased and installed property, including, *inter alia*," the Contested Items. (*Id.* ¶ 15.) The parties stipulated that the Contested Items were purchased and used by Petitioner in fulfillment of its obligations as a contractor or subcontractor under construction contracts with the Commonwealth and its subdivisions, and that Petitioner did not pay sales tax upon purchase of the Contested Items nor did Petitioner remit use tax for the Contested Items. (*Id.* ¶¶ 27-30.)

### A. Prior Audit

Department performed a sales and use tax audit of Petitioner's business activities covering the period of January 1, 2001, through December 31, 2003 (Prior

Audit). (*Id.* ¶ 38.) As a result of the Prior Audit, Department issued an "Audit Report and Basis of Assessment" finding that Petitioner had "a *use* tax deficiency totaling $7,357.98." (*Id.* ¶¶ 39, 42; Ex. M.) Specifically, Petitioner was found to have a capital purchase "use tax deficiency of $7,357.98," and an expense purchase "use tax deficiency of $0.00." (*Id.* ¶ 42(a)-(b).) With respect to the expense purchases, the Prior Audit Report states:

> A complete examination of relevant expense acquisition transactions[] was performed to determine if sales tax was charged on the supplier[']s documentation, or if use tax was accrued and remitted to the Commonwealth. Expense purchase acquisition documents were traced to the purchase journal to verify receipt of all invoices. The cash disbursement/payment vouchers were then examined to verify payment of sales tax charged on the supplier's invoices. The use tax due was compiled, reported, and remitted to [t]he Commonwealth.
>
> Based upon these procedures it was determined that no use tax liability resulted from the complete audit of expense transactions for the audit period dated January 1, 2001[,] to December 31, 2003.

(*Id.* Ex. M, Prior Audit Report at 6.) Petitioner's business activities during the period of the Prior Audit included purchasing items similar to, and in the same categories as, the Contested Items; however, a use tax deficiency was **not** found with respect to those similar items. (*Id.* ¶¶ 45-46; Ex. N.)

### B. Current Audit

Department again performed a sales and use tax audit of Petitioner's business activities covering the period of January 1, 2011, through January 31, 2014 (Current Audit). (*Id.* ¶ 4.) As a result of the Current Audit, Department issued an "Audit Report and Basis of Assessment" finding that Petitioner has "a *use* tax deficiency totaling $107,136.82." (*Id.* ¶¶ 5, 19; Exs. A, B.) Specifically, Petitioner was found

3

to have a capital purchase "use tax deficiency of $1,296.60," and an expense purchase "use tax deficiency of $105,840.22." (*Id.* ¶ 19(a)-(b); Ex. B.) With respect to the expense purchases, the purchases at issue in this case, the Current Audit Report, like the Prior Audit Report, states that "[a] complete use tax examination of expenses and utilities was conducted," which included purchases of, among other things, the Contested Items, and the foregoing use tax deficiency was found to be owed. (*Id.* Ex. B., Current Audit Report at 7-8.) The Auditor found that the Contested Items were taxable as they did not qualify as BME as Petitioner suggested.

Petitioner filed a Petition for Reassessment with Department's Board of Appeals contesting the Current Audit's finding regarding the use tax deficiency. (*Id.* ¶ 6; Ex. C.) Department's Board of Appeals abated the penalties associated with the use tax deficiency, stating that "Petitioner [] prov[ed] good faith and lack of negligence to warrant the abatement of the penalties," but denied Petitioner any tax relief. (*Id.* Ex. D.) The Board of Appeals found that the Contested Items were not BME, but instead fell within the real estate structure exception to the use tax; however, this exception was **not** available to Petitioner because it is a construction contractor. (*Id.* Ex. D at 2.) Accordingly, the Board of Appeals concluded the Contested Items were subject to the Commonwealth's use tax.

Petitioner then filed a Petition for Review with the Board, requesting, *inter alia*, that the use tax assessed against the Contested Items be set aside. (*Id.* ¶ 8; Ex. E.) The Board reduced the use tax deficiency to $103,998.39, but denied Petitioner any relief with respect to the Contested Items. (*Id.* Ex. F.) The Board found that Petitioner had not met its burden of demonstrating that the Contested Items fell within the definition of BME. (*Id.* Ex. F at 7.) Further, the Board agreed with the Board of Appeals' conclusion that the Contested Items instead fell within the real

4

estate structure exception to the use tax, which does not apply to Petitioner since "property used by construction contractors . . . for or on behalf of the Commonwealth or its political subdivisions[] is subject to tax." (*Id.* (quoting Section 32.23(b) of Department's Regulations, 61 Pa. Code § 32.23(b)).)

### C. Appeal to this Court

Petitioner then filed a Petition for Review of the Board's Order with this Court.[2] Before this Court, Petitioner only contests the use tax assessed against the Contested Items, which totals $71,993.06.[3] (*Id.* ¶ 24.) Specifically, on appeal Petitioner argues that the Traffic Signal Related Purchases are exempt from the Commonwealth's use tax as those items constitute BME, and that the Commonwealth is estopped from assessing use taxes against any of the Contested Items because the Commonwealth did not assess taxes against similar items in the Prior Audit. The Commonwealth does not contest the relief afforded by the Board nor does Petitioner contest a portion of the assessment in the amount of $17,402.07. (*Id.* ¶¶ 21, 22.) Further, the parties have stipulated that Petitioner will receive a further reduction from the total assessment in the amount of $7,331.63. (*Id.* ¶ 23.)

---

[2] Rule 1571(h) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1571(h), authorizes this Court to review determinations made by the Board. When reviewing determinations of the Board, "this Court essentially acts as a trial court and exercises the broadest scope of review. Our standard of review is *de novo*. The stipulation of facts entered into by the parties is binding on them, although the Court may draw its own legal conclusions." *Luther P. Miller, Inc. v. Commonwealth*, 88 A.3d 304, 308 n.5 (Pa. Cmwlth. 2014) (citations omitted).

[3] The total contested amount is the sum of the following deficiency findings from the Current Audit: (1) $43,178.25 for the use of signal poles with mast arms; (2) $23,192.05 for use of light poles with mast arms; (3) $4,353.18 for use of camera poles with mast arms; and (4) $1,209.58 for use of pedestal bases. (Stip. ¶ 24.)

5

## II.  Discussion

### A. *Whether the Traffic Signal Related Purchases constitute BME.*

#### (1) Parties' Arguments[4]

Petitioner argues that the Traffic Signal Related Purchases are exempt from the Commonwealth's use tax because those items are BME. Specifically, Petitioner asserts that the term "traffic signals," which is included in the Code's definition of BME, includes the poles, mast arms, and anchor bases that support a traffic signal head, and that they, together, constitute a traffic control system. Petitioner makes the following three arguments in support of its interpretation that the term "traffic signals" includes the Traffic Signal Related Purchases.

First, citing this Court's decision in *Green Acres Contracting Company, Inc. v. Commonwealth*, 163 A.3d 1147, 1151 (Pa. Cmwlth. 2017) (*en banc*), *aff'd*, 180 A.3d 1217 (Pa. 2018) (*Green Acres*), Petitioner argues that the term "traffic signals" includes more than just the traffic signal head because "the signal head would not be able to operate to direct traffic" without the Traffic Signal Related Purchases supporting it. (Petitioner's Brief (Br.) at 12.)  As support for its position that the Contested Items are required for the functionality of the traffic signal head, Petitioner draws our attention to Exhibit H of the Stipulation and argues that the sample traffic signal plan therein demonstrates that the traffic "signal head is attached to the horizontal mast arm, which is in turn attached to a vertical pole, which is structurally supported by a pedestal base." (*Id.*)  Petitioner contends that the Traffic Signal Related Purchases serve two functions:

> (1) to elevate the signal head to a height and location in an intersection
> that allows drivers to clearly see the lights; and (2) to connect the signal

---

[4] We have combined the first two argument sections of Petitioner's brief for ease of discussion.

head, via conduit, to a power source, as well as the junction box and control assembly that link the signal head to the larger traffic control system.

(*Id.*) As further support for its position that the term "traffic signals" includes the Contested Items, Petitioner cites to Exhibit L of the Stipulation, which is the Pennsylvania Department of Transportation's (DOT) "Traffic Signal Design Handbook." Petitioner asserts that this handbook "uses the term 'traffic signal' to refer to the entire structure, and uses the term 'signal head' to refer to just the red, green, and yellow light fixture." (*Id.*) Thus, Petitioner concludes that "[b]ecause a traffic signal is a system of components designed to direct traffic, all parts of that system must be considered part of the term 'traffic signals.'" (*Id.* at 13.)

Second, Petitioner, again citing *Green Acres*, argues the Traffic Signal Related Purchases are included within the term "traffic signals" because they are not specifically excluded from the definition of BME. Petitioner contends that "a number of different components make up the traffic signal system, including conduit, wiring, junction boxes, poles, mast arms, and signal heads," and that because the definition of BME only excludes "certain of these components, such as 'conduit' and 'junction boxes,'" the components that are not specifically excluded from the definition are included as part of the term "traffic signals." (*Id.* at 13-14.)

Lastly, Petitioner argues that the Legislature's intent when drafting the Code was for the term "traffic signals" to include traffic signal related items. As support, Petitioner cites to a bill introduced in the Pennsylvania House of Representatives "proposing that the Code be amended to include 'traffic signal foundations, poles and mast arms'" because the Department's interpretation of the term "traffic signals" is too narrow. (*Id.* at 14 (quoting Stip. Ex. Q).)

7

Alternatively, Petitioner contends that if we conclude the term "traffic signals" does not include the Traffic Signal Related Purchases, those items are still exempt from the use tax as BME because the Contested Items are part of a traffic control system. Noting that the Code defines BME to include traffic control systems, Petitioner argues the Traffic Signal Related Purchases, along with the traffic signal head, constitute a traffic control system because "[a]ll of these components are designed to work together as a system to direct traffic." (*Id.* at 16.) Specifically, Petitioner asserts that without the Traffic Signal Related Purchases, "the [traffic] signal head would be unable to connect to" the traffic control system. (*Id.* at 16-17.)

In reviewing this matter, Petitioner contends the Commonwealth's interpretation of BME and more specifically the term "traffic signals" is not entitled to deference in this case because "the Commonwealth has issued no regulations, informal agency interpretations, or policy statements concerning the taxability of the [Traffic Signal Related Purchases]." (*Id.* at 18.)

The Commonwealth responds by arguing that the Traffic Signal Related Purchases are not BME because the plain, unambiguous definition of the term BME does not include the Traffic Signal Related Purchases. The Commonwealth disagrees that this case is akin to *Green Acres* because the per se list of items included within the definition of BME does not include any of the Traffic Signal Related Purchases. Since the Traffic Signal Related Purchases are not specifically listed in the per se list, the Commonwealth asserts, citing *Kinsley Construction, Inc. v. Commonwealth*, 894 A.2d 832 (Pa. Cmwlth. 2006), that Petitioner must meet a two-prong BME test for the Traffic Signal Related Purchases to qualify as BME. The Commonwealth asserts that "under the two-part test, a specific item [] must qualify first, as one of the five general equipment types" and "then qualify as one of

8

the ten [] specifically enumerated category subtypes."[5]  (Commonwealth's Br. at 19 (emphasis omitted).)  The Commonwealth concludes that since Petitioner has not argued that the Traffic Signal Related Purchases meet the two-part test, the Traffic Signal Related Purchases cannot constitute BME.

As to Petitioner's argument that the Traffic Signal Related Purchases are encompassed within the term "traffic signals," the Commonwealth disagrees. Instead, the Commonwealth suggests that the Traffic Signal Related Purchases are "structural supports," and, therefore, are "real estate structure" not BME.  Noting that Section 201(qq) of the Code, 72 P.S. § 7201(qq), defines the term "real estate structure" to include "structural supports," the Commonwealth asserts that the Traffic Signal Related Purchases cannot be BME because they are included within the term "real estate structure."   With respect to legislative intent, the Commonwealth contends that "it is clear the [L]egislature did not intend for structural supports to qualify for the BME exemption" since structural supports fall within the "real estate structure" exception to the use tax, which Petitioner does not qualify for as a construction contractor.[6]  (Commonwealth's Br. at 14.)  The Commonwealth also argues that Petitioner's legislative intent argument fails because legislative intent cannot be gleaned from bills proposed after the enactment of a statute.

---

[5] Section 201(pp) of the Code defines BME as "[g]eneration equipment, storage equipment, conditioning equipment, distribution equipment and termination equipment, which shall be limited to" the 10 enumerated categories of property appearing in the definition of BME.  72 P.S. § 7201(pp).

[6] The real estate structure tax exemption is only available to a "charitable organization, volunteer firemen's organization, volunteer firefighters' relief association[,] . . . nonprofit educational institution, or [] a religious organization for religious purposes."  Section 204(10) of the Code, 72 P.S. § 7204(10).  As such, the real estate structure tax exemption is not available to Petitioner as a construction contractor.

9

In its reply brief, Petitioner contends the Commonwealth "attempts to paint [Petitioner's] purchases as clearly and unambiguously excluded from the" definition of BME. (Petitioner's Reply Br. at 2.) Petitioner disagrees with the above argument and asserts that the term "traffic signals" is ambiguous because it can be read to mean "just the traffic signal head" or the entire traffic signal apparatus, including the Contested Items. (*Id.* at 3.) Petitioner takes the position that if the Legislature had intended to exclude the Traffic Signal Related Purchases from the definition of BME, the Legislature would have included the Traffic Signal Related Purchases in the list of items excluded from the definition of BME. As to the Commonwealth's argument that the Traffic Signal Related Purchases constitute "real estate structure," Petitioner asserts that the Commonwealth's

> analysis ignores the fact that other items in the definition of "real estate structure" do in fact appear within the definition of [BME.] For example, though the definition of "real estate structure" lists BME and "traffic control devices" as separate items, the BME definition includes "control systems" for "traffic." Additionally, though the definition of "real estate structure" lists BME and "millwork" as separate items, the BME definition includes "cabinetry," which can also be "millwork" in certain circumstances.

(*Id.* at 5.) Further, Petitioners argue that

> the definition of BME is clear about which items should qualify only as "real estate structure" and not as BME. The last sentence of the BME definition contains a number of items that do *not* constitute BME, and proceeds to list verbatim a number of items (including "guardrail posts" and "pipes") that are included as examples of real estate structure in the "real estate structure" definition.

(*Id.*) Since the Traffic Signal Related Purchases are not specifically excluded from the definition of BME, Petitioner concludes "the definition of 'real estate structure' does not provide clear guidance as to whether" the Traffic Signal Related Purchases

10

are BME. (*Id.* at 5-6.) Petitioner also takes issue with the Commonwealth's assertion that Petitioner has not demonstrated the Traffic Signal Related Purchases fall within one of the five categories of items used to define BME. Petitioner argues that it is neither "necessary [n]or useful to identify one of the five broad categories of BME" because the Traffic Signal Related Purchases are encompassed within the term "traffic signals," which are specifically included within the definition of BME. (*Id.* at 6.)

(2) Analysis

The Commonwealth's use tax is set forth in Section 202(b) of the Code, which imposes a six percent tax on the use within the Commonwealth of "tangible personal property purchased at retail." 72 P.S. § 7202(b). Section 201(o)(17) of the Code defines "use," in relevant part, as "[t]he obtaining by a construction contractor of tangible personal property or services provided to tangible personal property which will be used pursuant to a construction contract whether or not the tangible personal property or services are transferred." 72 P.S. § 7201(o)(17). Use tax is to be paid by the user unless sales tax was paid on the items in question at the time of purchase. 72 P.S. § 7202(a).

Here, the parties stipulated that Petitioner purchased the Contested Items in the course of its business as an electrical contractor for use in fulfillment of its obligations under contracts with the Commonwealth and its subdivisions, and that Petitioner did not pay sales tax upon the purchase of the Contested Items nor did Petitioner remit use tax with respect to the Contested Items. (Stip. ¶¶ 28, 29.) In light of these stipulated facts, Petitioner's purchase of the Contested Items was intended to be taxed under the Code unless an exemption to the use tax applies. *See*

11

*Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 620 (Pa. 2005); *see also* 61 Pa. Code § 32.23(b).

Petitioner argues that its Traffic Signal Related Purchases come within the BME exemption to the use tax. Section 204(57)(ii) of the Code provides that tax shall not be imposed against "[t]he sale at retail to or use by a construction contractor of" BME that is "transferred to . . . the Commonwealth or its instrumentalities or political subdivisions." 72 P.S. § 7204(57)(ii). BME is defined by Section 201(pp) of the Code as follows:

> Generation equipment, storage equipment, conditioning equipment, distribution equipment and termination equipment, which shall be limited to the following:
>
> > (1) air conditioning limited to heating, cooling, purification, humidification, dehumidification and ventilation;
> >
> > (2) electrical;
> >
> > (3) plumbing;
> >
> > (4) communications limited to voice, video, data, sound, master clock and noise abatement;
> >
> > (5) alarms limited to fire, security and detection;
> >
> > (6) **control system** limited to energy management, **traffic** and parking lot and building access;
> >
> > (7) medical system limited to diagnosis and treatment equipment, medical gas, nurse call and doctor paging;
> >
> > (8) laboratory system;
> >
> > (9) cathodic protection system; or
> >
> > (10) furniture, cabinetry and kitchen equipment.

12

> **The term shall include** boilers, chillers, air cleaners, humidifiers, fans, switchgear, pumps, telephones, speakers, horns, motion detectors, dampers, actuators, grills, registers, **traffic signals**, sensors, card access devices, guardrails, medial devices, floor troughs and grates and laundry equipment, together with integral coverings and enclosures, whether or not the item constitutes a fixture or is otherwise affixed to the real estate, whether or not damage would be done to the item or its surroundings upon removal or whether or not the item is physically located within a real estate structure. The term [BME] **shall not include** guardrail posts, pipes, fittings, pipe supports and hangers, valves, underground tanks, wire, conduit, receptacle and junction boxes, insulation, ductwork and coverings thereof.

72 P.S. § 7201(pp) (emphasis added). Petitioner argues that the Traffic Signal Related Purchases are included within the term "traffic signals," or, alternatively, are part of a "traffic control system," both of which are specifically included in the definition of BME.

To resolve Petitioner's argument that its Traffic Signal Related Purchases come within the definition of BME we must engage in statutory interpretation. As always, when engaging in statutory interpretation, we are guided by the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501-1991. "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). "[T]he best indication of legislative intent is the plain language of a statute." *Commonwealth v. Gilmour Mfg. Co.*, 822 A.2d 676, 679 (Pa. 2003). As such, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). "A statute is ambiguous when there are at least two reasonable interpretations of the text." *A.S. v. Pa. State Police*, 143 A.3d 896, 905-06 (Pa. 2016). When interpreting statutes, "[w]ords and phrases shall be construed

according to rules of grammar and according to their common and approved usage." Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a).

Generally, we "defer to the expertise of the agency upon which the General Assembly has vested enforcement or interpretive responsibilities." *Perrotta v. Dep't of Transp., Bureau of Driver Licensing*, 110 A.3d 255, 259 (Pa. Cmwlth. 2015). However, no deference is given "to an agency's interpretation of a statute where 'there is nothing in the record indicating that the [agency] ha[s] considered and decided [the] issue at a point prior to the instant litigation.'" *Harmon v. Unemployment Comp. Bd. of Review*, 207 A.3d 292, 300 (Pa. 2019) (quoting *Malt Beverage Distribs. Ass'n v. Pa. Liquor Control Bd.*, 974 A.2d 1144, 1154 (Pa. 2009)). Here, the record discloses no regulations, informal agency interpretations, policy statements or other indication of Department's interpretation of "traffic signals" prior to this case, nor does the Commonwealth argue that its interpretation here should be given deference. Therefore, pursuant to *Harmon*, we will not give deference to the Board or Department's interpretation of the term "traffic signals," as set forth in their respective determinations.

In reviewing this case we must be mindful that tax "**exemptions are to be strictly construed against the taxpayer**," *Plum Borough School District v. Commonwealth*, 860 A.2d 1155, 1157 n.4 (Pa. Cmwlth. 2004) (emphasis added),[7] and that "[t]he burden is on the taxpayer to prove that the transaction sought to be taxed is either not within the [] Code or is subject to an exemption," *DS Waters of America, Inc. v. Commonwealth*, 150 A.3d 583, 585 (Pa. Cmwlth. 2016).

---

[7] Although Section 204 of the Code is titled "[e]xclusions from tax," we have previously interpreted the section to provide exemptions from tax rather than exclusions because the items contained in Section 204 are intended to be taxed in the first place. *Plum Borough Sch. Dist.*, 860 A.2d at 1157.

The Code does not define the term "traffic signals." In the absence of a definition, pursuant to the rules of statutory construction, we construe the term "traffic signals" according to its common usage. 1 Pa.C.S. § 1903(a). "[T]raffic signal" is defined as "a **signal** (such as a **traffic light**) for **controlling traffic**." *Traffic Signal*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/traffic%20signal (last visited July 14, 2020) (emphasis added). "Signal" is defined as "something (such as a sound, gesture, or object) that **conveys notice or warning**" or "**an object used to transmit** or convey **information beyond the range of human voice**." *Signal*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/signal (last visited July 14, 2020) (emphasis added). Thus, a traffic signal is an object used to transmit information, such as a notice or warning, to control traffic.

The sample traffic signal plan provided by Petitioner shows two traffic signal heads connected to a mast arm, which is connected to a traffic signal pole, which in turn is anchored with a pedestal base. (Stip. Ex. H at 64.) Based upon the sample plan, it is clear that the Traffic Signal Related Purchases are required to elevate a traffic signal head above traffic when a traffic signal apparatus is built pursuant to this plan because, without the Traffic Signal Related Purchases, the traffic signal head could not operate to control traffic. Therefore, because a traffic signal head, containing the green, yellow, and red lights, by itself cannot transmit signals to control traffic without it being elevated over or near a roadway, more than merely the traffic signal head constitutes the "traffic signal." *See Traffic Signal*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/traffic%20signal (last visited July 14, 2020). Accordingly, poles, mast arms, and pedestal bases, in this case the Traffic Signal Related Purchases, are encompassed within the

15

term "traffic signals," when a traffic signal is built using a pole with mast arms because those items are required to support a traffic signal head for purposes of controlling traffic. With that being said, any conduit, receptacle, and junction boxes, which may be included within the term traffic signal, are subject to the Commonwealth's use tax because these items are specifically excluded from the definition of BME. *See* 72 P.S. § 7201(pp).

The Commonwealth contends Petitioner did not attempt to classify the Traffic Signal Related Purchases into one of the five categories of equipment constituting BME and, therefore, Petitioner did not meet its burden of demonstrating that the Traffic Signal Related Purchases constitute BME. However, for the reasons stated above, the Traffic Signal Related Purchases are included within the term "traffic signals," which is specifically included within the definition of BME. Thus, it is not necessary for Petitioner to first establish the Traffic Signal Related Purchases fall into one of the five categories of equipment included within BME because "traffic signals" are specifically included in the definition of BME.

In reaching the conclusion that the Traffic Signal Related Purchases are included within the term "traffic signals," it is persuasive that DOT's "Traffic Signal Design Handbook" distinguishes the term "traffic signal," which DOT uses to describe the **entire** traffic signal apparatus, from the term "signal head," which DOT uses to describe just the traffic signal head. (*Compare* Stip. Ex. L 2.1, 2.3, 20.1 *with* Stip. Ex. L 6.1.) If the Legislature intended for BME to include only the traffic signal head, the red, yellow, and green lights, the Legislature could have used the term "traffic signal head" instead of the term "traffic signal."

For example, in *Green Acres*, this Court was presented with a similar issue where we were required to interpret the scope of an undefined term included within

the definition of BME.  Specifically, in *Green Acres*, we examined "the scope of the term 'guardrails' as used in the definition of tax exempt" BME.  163 A.3d at 1148. The taxpayer in *Green Acres* argued "that the term 'guardrails,'" as used in the definition of BME, "refers to the entire guardrail system, with the exception of guardrail posts, which are specifically excluded." *Id.*  As such, the taxpayer concluded, the "nuts, bolts, washers, and guardrail blocks, which are necessary for the construction of the guardrails, constitute tax exempt BME." *Id.*  We agreed, concluding that the term "guardrails" includes "the nuts, bolts, washers, and guardrail blocks . . . utilized to connect the elements of the guardrail system." *Id.* at 1152.  Noting that federal and state transportation publications use the term "guardrail" to refer to more than just the railing itself, we reasoned that the dictionary definition and common usage of the term "guardrails" "includes the entire guardrail system." *Id.* at 1151 (emphasis omitted).  We further reasoned that the fact "[t]hat only the 'guardrail posts' are carved out as taxable explains the Legislature's decision" not to specifically list the tax status of all of the components of a guardrail system. *Id.* at 1152.  Accordingly, we concluded that since the definition of BME only excluded guardrail posts, the other components of a guardrail system "fall within the definition of 'guardrails,' and are therefore exempt from use tax as BME." *Id.*

The Commonwealth contends that *Green Acres* is distinguishable from the present matter because none of the Traffic Signal Related Purchases are included in the per se list of items included within the definition of BME.  Instead, the Commonwealth contends this case is similar to *Kinsley Construction*.  However, *Kinsley Construction* is distinguishable from the present case.  In *Kinsley Construction*, we examined, among other things, whether sound barriers and I-

17

beams constitute BME. We concluded that sound barriers and I-beams are not BME, reasoning that "had the [L]egislature intended sound barriers," which includes I-beams that hold the sound barriers in place, "to be considered [BME], they would have [] included [these items] in the lengthy definition" of BME. *Kinsley Construction*, 894 A.2d at 836. After *Kinsley Construction*, we decided *Strongstown B&K Enterprises, Inc. v. Commonwealth*, 152 A.3d 360 (Pa. Cmwlth. 2016). In that case we examined, among other things, whether traffic signs were included within the definition of BME. Citing *Kinsley Construction*, we concluded that traffic signs did not constitute BME, reasoning that "the Legislature did not specifically list 'traffic signs' as they did 'traffic signals.'" *Strongstown B&K Enters., Inc.*, 152 A.3d 368. Unlike in *Kinsley Construction* and *Strongstown B&K Enterprises, Inc.*, the question here is not whether the Traffic Signal Related Purchases are expressly included within the Code's definition of BME but whether the term "traffic signals," which **is** expressly included within the definition of BME, encompasses the Traffic Signal Related Purchases. Therefore, the present matter is similar to *Green Acres* in that we must interpret the scope of an undefined term specifically listed in the per se list of items that are BME.

Notwithstanding that the definition of BME includes the term "traffic signals," the Commonwealth argues that the Traffic Signal Related Purchases cannot be BME because those items are "real estate structure." Specifically, the Commonwealth asserts that the Traffic Signal Related Purchases are "support structures," which are specifically included in the definition of "real estate structure." However, there is nothing in the definitional section of the Code to indicate that each definition provided therein is exclusive. Section 201(qq) of the Code defines the term "real estate structure" to include:

18

**[BME]**; developed or undeveloped land; streets; roads; highways; parking lots; stadiums and stadium seating; recreational courts; sidewalks; foundations; **structural supports**; walls; floors; ceilings; roofs; doors; canopies; millwork; elevators; windows and external window coverings; outdoor advertising boards or signs; airport runways; bridges; dams; dikes; **traffic control devices**, including traffic signs; satellite dishes; antennas; guardrail posts; pipes; fittings; pipe supports and hangers; valves; underground takes; wire; conduit; receptacle and junction boxes; insulation; ductwork and coverings thereof; and any structure or item similar to any of the foregoing, whether or not the structure or item constitutes a fixture or is affixed to the real estate, or whether or not damage would be done to the structure or item or its surroundings upon removal.

72 P.S. § 7201(qq) (emphasis added). Thus, the Code defines "real estate structure" to include BME, evidencing that an item that is BME can also be considered "real estate structure." *Id.* Additionally, the Code defines "real estate structure" to include "traffic control devices." *Id.* Seeing that traffic control items are used in both the definitions of BME and "real estate structure," it is clear the definitions of BME and "real estate structure" overlap. Further, while the Traffic Signal Related Purchases are support structures in the sense that they support and elevate the traffic signal head, the Traffic Signal Related Purchases, for the foregoing reasons, are included within the term "traffic signal," which is specifically included with the definition of BME. Absent any statutory language indicating that the Traffic Signal Related Purchases cannot be BME simply because they may also fall within the definition "real estate structure," we cannot conclude the Traffic Signal Related Purchases cannot be included in the term "traffic signals."

Additionally, the definition of BME does not specifically exclude the Traffic Signal Related Purchases. If the Legislature did not intend the Traffic Signal Related Purchases to be included within the term "traffic signals," or more importantly within the definition of BME, the Legislature could have included the Traffic Signal

19

Related Purchases in the list of items specifically excluded from the definition of BME as it did conduit, receptacle, and junction boxes. As such, for the reasons set forth above, Petitioner's Traffic Signal Related Purchases come within the BME exemption as a "traffic signal."[8]

B. *Whether the Commonwealth is estopped from assessing use taxes against Petitioner for the purchase and use of the Contested Items.*

(1) Parties' Arguments

Petitioner argues that "[t]he Commonwealth's failure to assess use taxes" on the whole of the Contested Items "during the Prior Audit equitably estops it from doing so" now. (Petitioner's Br. at 18.) Petitioner contends:

> The Commonwealth's auditor represented in its [Prior] Audit Report that [Petitioner] did not owe any use taxes for the Contested Items during the period reviewed for the Prior Audit. It was reasonable for [Petitioner] to rely on the results of the Commonwealth's audit because the process involved extensive pre- and post-audit conferences, the provision of exhaustive documentation by [Petitioner], and book and record surveys by the Commonwealth's auditor relative to the Contested Items. . . . The [Prior A]udit and apparent seal of approval by the Commonwealth reasonably led [Petitioner] to engage in further projects involving the Commonwealth and the Contested Items such that [Petitioner], to its detriment, did not remit any use tax for the Contested Items during the time period of the Current Audit.

(*Id.* at 19-20.) Petitioner made a similar argument before the Board, asserting:

> If no legislation was passed, and no notification issued, it seems completely unreasonable to expect entities such as [Petitioner] to have any reason to make changes to policies and procedures regarding [s]ales

---

[8] Petitioner also argues that the Traffic Signal Related Purchases are exempt from the Commonwealth's use tax as BME because those items are part of a "traffic control system." In light of our conclusion that the term "traffic signals" includes the Traffic Signal Related Purchases, we need not address Petitioner's argument that those items are part of a "traffic control system."

20

and [u]se [t]ax that have been followed diligently for years, and been given previous approval by the [] Department.

(Stip. Ex. C, Petition for Review to the Board at 4.) Petitioner argues that given the extensive nature of the Prior Audit, which was reviewed by a supervisor, it reasonably relied upon the Prior Audit, and as a result did not remit use tax or otherwise factor the cost into its bids, which was to Petitioner's detriment. Moreover, Petitioner contends that "[o]ther contractors who [sic] have not experienced the Commonwealth's equivocation in applying its own sales and use tax exemptions may submit a much lower bid that does not include use taxes on the Contested Items." (Petitioner's Br. at 22.) Finally, Petitioner contends "the Commonwealth has changed its position" abruptly and without any notice. (*Id.*) In light of the representations made in the Prior Audit, Petitioner argues it "could not have reasonably foreseen" the deficiency assessment made against the Contested Items in the Current Audit. (*Id.* at 21.)

The Commonwealth responds, citing *Commonwealth v. Western Maryland Railroad Company*, 105 A.2d 336 (Pa. 1954), and *DS Waters of America, Inc.*, by arguing that the doctrine of equitable estoppel is "inapplicable against the Commonwealth's exercise of its taxing authority." (Commonwealth's Br. at 27.) The Commonwealth further argues that even assuming *arguendo* that *Western Maryland Railroad Company* and *DS Waters of America, Inc.* were wrongly decided, Petitioner's argument regarding equitable estoppel would still fail because Petitioner has not demonstrated the elements for equitable estoppel.

In its reply brief, Petitioner argues that *DS Waters of America, Inc.* did not reaffirm the holding in *Western Maryland Railroad Company*. While acknowledging that in *DS Waters of America, Inc.* this Court cited to *Western Maryland Railroad Company*, Petitioner contends that the holding in *DS Waters of*

21

*America, Inc.* was based upon collateral estoppel, which is a distinct legal theory from equitable estoppel. Citing *In re Estate of Leitham*, 726 A.2d 1116 (Pa. Cmwlth. 1999), and *Department of Revenue, Bureau of Sales and Use Tax v. King Crown Corporation*, 415 A.2d 927, 930 (Pa. Cmwlth. 1980), Petitioner contends that "this Court has applied equitable estoppel to the Commonwealth's taxing power on numerous occasions." (Petitioner's Reply Br. at 11.)

(2) <u>Analysis</u>

"The doctrine of estoppel is an equitable remedy that may be asserted against the government in this jurisdiction." *Chester Extended Care Ctr. v. Dep't of Pub. Welfare*, 586 A.2d 379, 382 (Pa. 1991). "[E]quitable estoppel recognizes that an informal promise implied by one's words, deeds, or representations[,] which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity. The two essential elements of equitable estoppel are inducement and justifiable reliance on that inducement." *Belleville v. David Cutler Grp., Inc.* 118 A.3d 1184, 1199 (Pa. Cmwlth. 2015) (citations omitted). It is well established that when examining whether the elements of equitable estoppel are present

> [t]he inducement may be words or conduct and the acts that are induced may be by commission or forbearance provided that a change in condition results causing disadvantage to the one induced. More important, the laws require that . . . [t]he representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel.

*Id.* (quoting *Zitelli v. Dermatology Educ. & Research Found.*, 633 A.2d 134, 139 (Pa. 1993)) (emphasis omitted). In summary, for equitable estoppel to be found here, Petitioner would have to show the Commonwealth: "(1) intentionally or negligently misrepresented some material facts, (2) knowing or having reason to know that the

22

[Petitioner] would rely on that misrepresentation, [] (3) thereby induc[ing] [Petitioner] to act to [its] detriment." *Borkey v. Township of Centre*, 847 A.2d 807, 811 (Pa. Cmwlth. 2004). "[T]he burden rests on the party asserting the estoppel to establish such estoppel by clear, precise[,] and unequivocal evidence." *Eagleview Corp. Ctr. Ass'n v. Citadel Fed. Credit Union*, 150 A.3d 1024, 1032 (Pa. Cmwlth. 2016) (quoting *Blofsen v. Cutaiar*, 333 A.2d 841, 844 (Pa. 1975)).

While equitable estoppel may be asserted against the government, "estoppel will not lie against the government where the acts of the governmental entity's employees or agents are in violation of positive law." *County of Beaver ex. rel. Beaver Cty Bd. of Comm'rs v. Sainovich*, 96 A.3d 421, 431 (Pa. Cmwlth. 2014). Importantly for this case, our Supreme Court has held the Commonwealth cannot be estopped from collecting taxes that erroneously were not collected or were under-assessed in the past. In *Western Maryland Railroad Company*, our Supreme Court declined to apply the doctrine of equitable estoppel to preclude the Commonwealth's attempt to collect corporate taxes from a company which, "for a period of over 20 years" did not pay taxes legally due and owing because an officer in the Department, "who, acting under a mistaken impression of the applicable law, either did not impose the taxes or compromised them for lesser amounts than were properly due." 105 A.2d at 340. The Court explained that the company

> should not now be allowed to claim that because of [] mistaken indulgence and errors of administrative practice no taxes can be imposed by the Commonwealth for any subsequent years.[] It is a fundamental legal principle that a State or other sovereignty cannot be estopped by any acts or conduct of its officers or agents in the performance of a governmental as distinguished from a proprietary function. No errors or misinformation of officers or agents can estop the government from collecting taxes legally due.

23

*Id.* at 340-41 (internal footnote omitted). Thus, pursuant to *Western Maryland Railroad Company*, the Commonwealth cannot be estopped from assessing new or future taxes legally due against a taxpayer merely because those taxes were erroneously not assessed in the past.

In *DS Waters of America, Inc.*, we relied on this general principle to reject a taxpayer's collateral estoppel argument, holding "that [] Department was not estopped from assessing a use tax against DS Waters due to a decision of an administrative board issued to a predecessor in interest regarding its operating during a separate tax year." 150 A.3d at 592.

Petitioner challenges the Department's reliance on *Western Maryland Railroad Company* and its progeny, contending that subsequent to this line of cases, "this Court has applied equitable estoppel to the Commonwealth's taxing power on numerous occasions." (Petitioner's Reply Br. at 11.) In support, Petitioner cites *In re Estate of Leitham* and *King Crown Corporation*.

Petitioner is correct that, in very limited circumstances, the Court has applied equitable principles to the Commonwealth's taxing power. Although *In re Estate of Leitham* involved the doctrine of laches,[9] and not equitable estoppel, and so is not precisely on point, our discussion there is instructive. In *In re Estate of Leitham*, we examined whether Department could assess additional taxes on an estate more than eight years after the estate filed its inheritance tax return. The Court first examined the six-month time frame for Department to take certain actions, as mandated by statute, unless additional time is requested, which did not occur, and found Department's actions untimely. *In re Estate of Leitham*, 726 A.2d at 1118-19. Even

---

[9] "A party asserting laches must establish two essential elements: (1) a delay arising from the complaining party's failure to exercise due diligence and (2) prejudice to the asserting party resulting from the delay." *Nigro v. City of Philadelphia*, 174 A.3d 693, 699 (Pa. Cmwlth. 2017).

if the statute did not provide for a specific time period for Department to act, the Court found the equitable doctrine of laches would apply as there was both a delay arising from Department's failure to use due diligence, and prejudice to the estate resulting from the delay as the estate was closed and all assets distributed. *Id.* at 1119.

The Court recognized the historical reluctance of courts to apply doctrines of estoppel to the government, and, similar to sovereign immunity, found that there has been some modification. *Id.* at 1120. Nonetheless, we cautioned that courts "will require a **stronger showing** when estoppel is asserted against a governmental entity than when it is asserted against an individual." *Id.* (emphasis added). The Court affirmed that "modern advances in case law left **intact** the principle which the Supreme Court enunciated in . . . *Western Maryland Railroad Company*," which was "**failure to collect the tax in the past is no bar to present collection.**" *In re Estate of Leitham*, 726 A.2d at 1120 (emphasis added). However, in *In re Estate of Leitham,* the estate did not seek "insulation from future tax liability," but instead to "estop the [ ] claim for taxes previously due," which Department had failed to claim with due diligence for eight years. *Id.* Therefore, the holding in *Western Maryland Railroad Company* did not apply, and the Court held that Department was estopped from assessing additional taxes against the estate. *In re Estate of Leitham*, 726 A.2d at 1119.

Petitioner also directs us to *King Crown Corporation,* in which the Court applied equitable estoppel against the Commonwealth. In *King Crown Corporation*, an assistant attorney general sent a letter to the taxpayer appearing to accept a compromise and settlement agreement for sales taxes owed. The Commonwealth attempted to renege on the settlement and compromise agreement, arguing that the

proper authorities had not approved the agreement. The taxpayer argued that the Commonwealth was equitably estopped from reneging on the agreement. We noted that

> [e]quitable estoppel is a doctrine of fundamental fairness, dependent on the particular facts of each case; it arises when "a party, by acts or representations intentionally or through culpable negligence, induces another to believe that certain facts exist and such other relies and acts on such belief, so that the latter will be prejudiced if the former is permitted to deny the existence of such facts."

*King Crown Corporation*, 415 A.2d at 929 (quoting *Bd. of Educ. of Sch. Dist. of Phila. v. Phila. Fed'n of Teachers Local No. 3, AFT, AFL-CIO*, 397 A.2d 1273, 1280 (Pa. Cmwlth. 1979)). Applying the doctrine, the Court stated that "[e]stoppel here thus depends on the **reasonableness** of [the taxpayer]'s belief that a settlement had been agreed upon, and the existence of **intent or 'culpable negligence'** on the part of the Commonwealth's agent in creating that belief." *Id.* at 930 (emphasis added). The Court found relevant the testimony of the taxpayer's officer, which was corroborated by a certified public accountant (CPA) retained by the taxpayer, that the assistant attorney general who wrote the letter had told the officer that he could not make the decision, but the agreement had to be presented to someone else, and he would get back to taxpayer in a week. The taxpayer received the letter a week later, and it was consistent with the earlier discussion. In addition, we noted that the taxpayer had been remitting monthly payments in compliance with the agreement since that time. In reviewing the letter, the Court found it communicated the Commonwealth's acceptance of the settlement, reasoning the letter "[wa]s consistent with a belief that the assistant attorney general had in fact secured the proper approvals, and was informing [the taxpayer] of the Commonwealth's decision. . . ." *Id.* We, therefore, concluded the taxpayer's belief, "that a valid compromise had

26

been agreed upon, is fully reasonable . . . [and] that the necessary approvals had been secured. . . ." *Id.* Since the Commonwealth had the files, nothing indicated that the taxpayer should not have believed what the letter said, and there was nothing that would give rise to a suspicion that the assistant attorney general was acting outside his authority. *Id.* Upon review of these facts, we determined that "estoppel [wa]s appropriate to preclude the Commonwealth from denying the validity of the [agreement], and likewise from repudiating the agreement." *Id.* In doing so, we concluded "[t]he estoppel herein emanates from the . . . letter of the [a]ssistant [a]ttorney [g]eneral" who had apparent authority to accept the agreement and that the taxpayer justifiably relied upon that letter and so made the monthly payments set forth in the agreement. *Id.*

Consistent with *Western Maryland Railroad Company* and *DS Waters of America, Inc.*, the equitable doctrine of estoppel generally does not prevent the Commonwealth from pursuing taxes that are owed. *W. Maryland R.R. Co.*, 105 A.2d at 340-41; *DS Waters of America, Inc.*, 150 A.3d at 592. However, as *King Crown Corporation* and *In re Estate of Leitham* have shown, the application of equitable estoppel is "dependent on the particular facts of each case." *King Crown Corporation*, 415 A.2d at 929. Applying the law to the facts presented here, we cannot conclude that Petitioner has shown, through "clear, precise[,] and unequivocal evidence," that equitable estoppel should apply. *Eagleview Corp. Ctr. Ass'n*, 150 A.3d at 1032 (citation omitted).

First, we recognize that Petitioner is not arguing that laches would apply here, as the estate did in *In re Estate of Leitham*, where Department waited more than eight years to pursue taxes, despite an express statutory provision providing only six months, 726 A.2d at 1118-19, because here, there is no allegation that the Current

27

Audit was in any way untimely. Nonetheless, the Court in *In re Estate of Leitham* confirmed that failure to collect taxes in the past does not bar current or future collection. Unlike in *In re Estate of Leitham*, where Department sought to go back and assess additional taxes for a certain tax period eight years after the relevant tax return was filed, the issue presented in this case is whether taxes are due for the Current Audit period, which is still being litigated. As the Court stated in *In re Estate of Leitham*, the general principle set forth in *Western Maryland Railroad Company* that estoppel does not bar the Commonwealth from pursuing taxes was "left intact" and the "failure to collect the tax in the past is no bar to present collection." *In re Estate of Leitham*, 726 A.2d at 1120. Instantly, Department is seeking to tax the Contested Items that were purchased during the Current Audit period, not the Prior Audit period. Had Department been seeking to collect use taxes owed on the items similar to the Contested Items which had been purchased during the period of the Prior Audit, *In re Estate of Leitham* may be applicable, but that is not the case here.

This case is also unlike *King Crown Corporation* where the Department was estopped from assessing taxes based upon a settlement agreement that applied to the tax period at issue. In that case, there was considerable evidence to support that a representation was made, upon which the taxpayer reasonably relied. There was the testimony of the taxpayer's officer, which was corroborated by a CPA, about discussions with the assistant attorney general; a letter from the assistant attorney general received a week later, as promised, which was consistent with the earlier discussion; and the taxpayer's remittance of payments consistent with the agreement. *King Crown Corporation*, 415 A.2d at 930. Based upon these acts, we held it was reasonable for the taxpayer to believe that the assistant attorney general secured the necessary approval of the agreement. *Id.* Here, the quantum of evidence

28

is significantly less. There was no representation in the Prior Audit Report that the use tax would not be assessed against the Contested Items **in a future audit**. At most, Department, through its auditor, represented that Petitioner did not owe use tax on items similar to the Contested Items during the Prior Audit period. Again, Department is not seeking to assess use tax against those items from the Prior Audit. We require a "stronger showing" to apply the doctrine of estoppel against the government and its taxing authority. *In re Estate of Leitham*, 726 A.2d at 1120. Unlike the estate in *In re Estate of Leitham* or the taxpayer in *King Crown Corporation*, Petitioner did not make that stronger showing here.

This matter is akin to *DS Waters of America, Inc.*, wherein the taxpayer was seeking to assert estoppel on the basis of representations an administrative board made to the taxpayer's predecessor-in-interest during a separate tax year. 150 A.3d at 592. Although here, there is no predecessor-in-interest involved, the principle remains the same: a taxpayer cannot rely upon an earlier audit to prevent it from paying taxes assessed in a subsequent audit. As explained by the Supreme Court in *Western Maryland Railroad Company*, a taxpayer "should not be allowed to claim that because of [] mistaken indulgence and errors of administrative practice no taxes can be imposed by the Commonwealth for any **subsequent** years." 105 A.2d at 340-41 (emphasis added). Although we are sympathetic to Petitioner because it was following an interpretation of the use tax provisions that it thought was correct, and was not aware of the Department's current interpretation, based upon our Supreme Court's precedent as well as our own, we cannot conclude that any representation made in the Prior Audit Report, to the extent one was made, could estop the Department from seeking to assess taxes on similar items 10 years later.

29

## III. Conclusion

Accordingly, we conclude the Traffic Signal Related Purchases, as used in the present matter, are BME and, as such, are exempt from the Commonwealth's use tax pursuant to Section 204(57)(ii) of the Code.  We further conclude that because the Commonwealth is not estopped from assessing use taxes on the Contested Items, the Contested Items, other than the Traffic Signal Related Purchases, are subject to the Commonwealth's use tax.

_____

**RENÉE COHN JUBELIRER,** Judge

Judge Fizzano Cannon did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kuharchik Construction, Inc.,      :
                Petitioner      :
         :
         v.      :    No. 486 F.R. 2015
         :
Commonwealth of Pennsylvania,      :
                Respondent      :

## O R D E R

**NOW**, July 15, 2020, the July 21, 2015 Order of the Board of Finance and Revenue (Board), entered in the above-captioned matter, is hereby **AFFIRMED** in part and **REVERSED** in part. Consistent with this Court's Opinion in this case, the Board's Order is affirmed with respect to the use taxes assessed against the light and camera poles, the corresponding mast arms, and any pedestal bases used to anchor the light and camera poles. The Board's Order is reversed with respect to the use taxes assessed against the poles, mast arms, and pedestal bases used to support traffic signal heads. Unless exceptions are filed within 30 days pursuant to Pennsylvania Rule of Appellate Procedure 1571(i), Pa.R.A.P. 1571(i), this matter is remanded to the Board to reduce the use taxes assessed against Kuharchik Construction, Inc. for the period of January 1, 2011, through January 31, 2014, in accordance with the Court's Opinion in this case.

 

                                   _____
                                   **RENÉE COHN JUBELIRER,** Judge